Gerome McCULLOUGH, Petitioner,

v.

Gary H. FILION, Superintendent, Respondents.

No. 01–CV–6484.

United States District Court, W.D. New York.

March 31, 2005.

Gerome McCullough, Coxsackie, NY, pro se.

Loretta S. Courtney, Monroe County District Attorney's Office, Rochester, NY, for Defendant.

**DECISION AND ORDER**

BIANCHINI, United States Magistrate Judge.

**INTRODUCTION**

Gerome McCullough ("McCullough") filed this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Monroe County Court on two counts of murder in the second degree and three counts of robbery in the first degree. The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(b).

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Benny Lee Dukes ("Dukes") was shot at close range in the chest and killed while he was being robbed by McCullough, Dedric Chislum ("Chislum"), Larry Williams ("Williams"), and Anthony Latson ("Latson"). All four suspects were arrested on November 22, 1994, and all four gave statements to the police in which they inculpated each other.

As a result of the *Bruton*[1] problems created by their statements, the co-defendants were tried separately from each other. McCullough was tried before a jury in Monroe County Court (Maloy, J.). A summary of the relevant trial testimony follows.

On the night of November 19, 1994, Dukes was visiting his friends Luz Roman ("Roman"), and her daughter, Maria Bermudez ("Bermudez"), at their apartment on Maria Street in the City of Rochester. Angela Timmons ("Timmons"), who lived next door, was also present. Timmons indicated that she, Roman and Bermudez were smoking crack cocaine that evening. T.394–95.[2] Timmons testified that she had been high on crack for the previous three days and had only slept for thirty minutes during that time. T.423–24. However, she testified that she last smoked cocaine about an hour to an hour and a half before the shooting, and that by the time that she witnessed the incident, she was no longer high. T.413, 458.

At one point that night, Timmons's brother, Chislum (a/k/a "Deke"), entered the apartment. Bermudez testified that Chislum asked to borrow Dukes's car, which was parked outside in the driveway.

1. *Bruton v. United States*, 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (holding that admission of confession directly inculpating codefendant in joint trial violated codefendant's rights under the Confrontation Clause of the Sixth Amendment).

2. Citations to "T.__" refer to the trial transcript.

T.501. Dukes refused, and Chislum left. Bermudez testified that Timmons's nephew, Williams (a/k/a "D'Nice"), later appeared and asked Roman if she had any money. Roman informed Chislum that she had none, and he left. T.501–02.

Dukes decided to leave Roman's house at around midnight. When he left, only Bermudez, Roman, and Timmons were in the apartment. Timmons testified that as Dukes stepped out onto the front porch, he "got grabbed." T.398. When Timmons ran to the window, she witnessed Chislum, McCullough, Williams, and Latson pushing Dukes around and demanding that he hand over his money. T.398–400, 405. Timmons said that her brother, Chislum, had a shotgun trained on Dukes. T.400. Timmons testified that Williams was her nephew, and that she only knew McCullough and Latson by their street names, "Chunky" and "Gilla", respectively. T.399. Bermudez identified McCullough, whom she knew by his street name of "Chunky," as one of the attackers and saw that Chislum had a gun pointed at Dukes. T.504.[3] Roman also witnessed the incident, and testified that "Chunky" participated in the assault on Dukes. T.764.

Timmons testified that she heard Dukes say that he only had five dollars and that they could have it. T.405. During the ensuing struggle, Dukes fell over the porch railing, landing in the front yard, where Williams, McCullough and Latson continued the assault. Timmons heard Chislum yell, "Move, man, move," and his three cohorts moved away from Dukes. T.407. Timmons saw Chislum fire the shotgun at Dukes from close range, causing him to fall to the ground. T.408. She testified that Dukes and Chislum were "standing face to face and the gun was pointed dead at [Dukes]." T.479.

However, Dukes was able to get up and flee from his attackers. Timmons observed Latson follow Dukes through the "cut," a path leading from 21 Maria Street (located across the street from 18 Maria Street), to Theodore Street. She then heard more shots ring out in the area of either Theodore Street or Joseph Avenue. T.410. The resident at 21 Maria Street, Dhoretha Pass ("Pass"), heard the footsteps of someone running through her backyard; she then saw four men run through her yard. Pass recognized Williams and Chislum, who was carrying a shotgun over his shoulder, but she did not recognize the other two men. T.780. Pass testified that Chislum, Williams, and Latson were friends of hers, and that she knew McCullough as a friend of theirs. T.777. She knew McCullough only as "Chunky." T.778. Moments later, Pass heard two more shots fired.

Timmons testified that about twenty minutes later, Williams returned to 18 Maria Street carrying the shotgun. T.412. Williams said to the three women, "[Y]ou all ain't [sic] seen nothing [sic], you all ain't [sic] heard nothing [sic], right?" T.412. Williams, Roman, and Bermudez all said, "[R]ight," because they were scared. T.412. No one called the police.

Dukes's body was discovered on November 21, 1994, at about noon, slumped against the back door of a vacant house on Theodore Street, about a block away from

---

3. On cross-examination, defense counsel introduced a statement allegedly made by Bermudez to two investigators that she "did not see Chunk do anything when [she] saw the four guys outside." Bermudez denied that she made the statement, indicating that she does not know how to read or write English and that the two investigators who came to her house were "just telling [her] the words" and she did not know what she was saying. T.530, 533. She testified that one of the investigators told her that he was her lawyer. She claimed at trial that the statement was false. T.531–32

Maria Street. T.342–43. It was later determined that Dukes died of massive internal bleeding from a gunshot wound to the chest.

McCullough, nineteen years-old at the time of trial, testified that he had reached the eleventh grade, but that he could not write and did not understand what defense counsel meant by "printing." T.844. McCullough's special education teacher testified that he was classified as mentally retarded and that his verbal comprehension was approximately at the second grade level. T.811. McCullough testified that on the night of the murder, he had gone to a friend's party on Joseph Avenue and had seen Deke (i.e., Chislum), D'Nice (i.e., Williams) and another person named "Chicken." T.851. He claimed not to have seen Gilla (i.e., Latson), whom he did not know very well, at the party. He described Chislum and Williams as his friends, but said that he did not hang out with them very often. T.889.

McCullough testified that at some point, he, Chislum, Williams and Chicken left the party and went to Chislum's house on Maria Street. T.852. McCullough related that Chislum started acting strangely, pacing the floor and saying that "people owed him money." T.855. He directed Williams to go retrieve his gun, and Williams brought it to him. T.855–56. McCullough testified that Chislum did not say anything about the gun or a robbery, but on cross-examination he testified that Chislum said that "he was going to get his money." T.860, 879. When asked what he thought Chislum was going to do with the gun, McCullough stated that he did not know and that

"[e]verybody got a mind of their own." T.889.

McCullough recounted that Chislum, Williams and Chicken went next door to 18 Maria Street while he remained standing on the front porch of Chislum's house. T.857. McCullough testified that a man exited the house and was accosted immediately by Chislum, who stuck a gun in his face. T.857. McCullough said that when he saw this, he stepped off the porch and walked to the sidewalk in front of 18 Maria Street where he stood by some bushes and listened to them "tussling." T.859–60.

McCullough testified that he heard the gun go off and saw Dukes tumble through the bushes, get up, and run across the street. T.863. He said that Chislum "came to the bushes and the gun was sort of pointed at [him]." T.863. McCullough told Chislum to "chill," that is, to stop what he was doing. T.863. McCullough said that Chislum then chased after Dukes. Shortly thereafter, McCullough heard several more gunshots. McCullough testified that he then got his coat from Chislum's house and walked home. T.865.

When he was brought in for questioning by the police, McCullough initially stated that he was home all night with his mother. T.886–87. Upon learning that his mother would not corroborate his alibi, he testified that he told the police that he was present at Maria Street but did not move from the porch. T.888. McCullough conceded that he gave the police a third version of that evening's events in which he stated that he walked down to the sidewalk and stood near some bushes during the struggle. T.888. This was reduced to a written statement which was introduced at trial.[4]

4. McCullough's statement read in relevant part as follows: "... I am 18 years old and I live at # 232 Avenue A. Last Saturday night, 11–19–94, I went to a party at a friend's house.... While I was at the party I met up

with Deke, D'Nice, and another guy named Gilla. When we left the party we walked straight to Deke's house at # 20 Maria Street. We went inside to Deke's bedroom which is on the first floor. While we were inside the

McCullough claimed at trial that the statement was incorrect in that there was no one named "Gilla" at 18 Maria Street. McCullough indicated that the fourth perpetrator had a "funny" name that he could not remember, and he only agreed that it was "Gilla" after the police suggested the name to him. T.870. McCullough testified that he had only been in the neighborhood of 18 Maria Street on two occasions prior to the shooting. T.874. He testified that he had known Timmons for quite a while. T.873. At trial, upon being shown the rights waiver card used by the police, McCullough testified that he did not know what those warnings meant. T.883. He also stated that he "couldn't read [his statement] at that time." T.884.

On January 30, 1996, the jury returned a verdict convicting him two counts of second degree murder (intentional murder and felony murder) and three counts of first degree robbery. McCullough was sentenced on February 28, 1996, to indeterminate terms of imprisonment of 25 years to life for each murder count, and 8⅓ to 25 years for each robbery count. All sentences were to be served concurrently.

McCullough appealed his conviction to the Appellate Division, Fourth Department, of New York State Supreme Court. Appellate counsel raised the same grounds on direct appeal as McCullough now raises in his habeas petition. The Fourth Department unanimously affirmed his conviction on December 27, 2000. *People v. McCullough*, 278 A.D.2d 915, 718 N.Y.S.2d 526 (4th Dept.2000). The Court of Appeals denied leave to appeal on April 16, 2001. *People v. McCullough*, 96 N.Y.2d

bedroom Deke started pacing around the room. Deke was pacing around the room saying that people owed him loot. He was pretty drunk and he was acting different than he usually does. Like he had a problem. He told D'Nice to go get the gauge, which is a shotgun. Deke kept saying that people owed him money and that he was going next door to get his. I knew that he was going to rob somebody next door of their money but I didn't know who it was going to be .... The four of us walked next door to the white house. Deke, D'Nice and Gilla walked up the stairs onto the front porch. I was standing by the bushes next to the sidewalk. A man had come out of the house and stepped onto the porch. Deke pointed the gun at the man and somebody told the man to shut up and don't do anything. The door slammed shut. They were all giving the man instructions at once and the man was saying all right. He was trying to do what they wanted. I don't know what happened next. I'm not sure if someone pushed the man off that porch or what, but that man came over the banister off the porch and landed on the ground next to the bushes. The guys started struggling with the man on the ground and then I heard some jingling like they were going through the man's pockets where his money was. Next I heard a shot go off and the man came through the bushes and landed across the sidewalk near where I was. The man got up. His pants were down and he was trying to grab his pants and get the hell out of there. The man ran across Maria Street and then Deke came through the bushes with the gauge pointed out. The gun was kinda pointed at me as he came through the bushes and I said, [']yo, Deke, chill[,] man.['] Deke just ran after the man. The man had run across Maria Street and through a cut towards Theodore Street. Deke ran right after him and I heard another shot go off, and then another. There were three shots total. Gilla and D'Nice came out of the bushes counting the man's money. Deke came back with the gauge and all three were standing on Deke's porch counting the money and change. They were saying that this wasn't enough loot. I went inside to Deke's room and got my coat and left. I didn't say nothing to them. I just looked at Deke and then jetted. I left because I didn't feel right about what happened. On 11–21–94 some investigators from the Rochester Police Department came to my house and said that they had some questions for me. I went with them to their office where I gave them this true statement. While I was there Investigator Sheridan asked me to look at a manila envelope with six pictures. I saw D'Nice's picture in spot # 3. Then I looked through some other pictures and saw Deke's picture in spot # 2...." T.554–57.

803, 726 N.Y.S.2d 381, 750 N.E.2d 83 (N.Y. 2001).

This Federal habeas petition followed. Respondent makes no claim that McCullough has failed to exhaust his State court remedies, and I find that all of McCullough's claims have been fully exhausted and are properly before this Court on habeas review. For the reasons set forth below, the petition is denied.

## DISCUSSION

### I. Standard of Review

Because this petition, filed September 19, 2001, postdates the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), AEDPA's revisions of 28 U.S.C. § 2254 govern this proceeding. *See Williams v. Taylor,* 529 U.S. 362, 402, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). When Congress enacted AEDPA, it "significantly curtailed the power of federal courts to grant the habeas petitions of state prisoners." *Lainfiesta v. Artuz,* 253 F.3d 151, 155 (2d Cir.2001) (citing *Williams,* 529 U.S. at 399, 120 S.Ct. 1495). A Federal court may not grant a habeas petition on a claim that was adjudicated on the merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) and (2).

A State court decision is "contrary to" established Federal law if the state court either "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams,* 529 U.S. at 405–06, 120 S.Ct.

1495. A State court decision is an "unreasonable application" of Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular case." *Id.* at 407–08, 120 S.Ct. 1495.

### II. Merits of the Petition

#### A. In-court identification based upon insufficient evidence

McCullough asserts that the trial court erred in allowing Timmons to make an in-court identification of him as "Chunky." He argues that Timmons "did not know [him] and, as related by investigating officer, was not able to provide a proper name during observation." Habeas Petition ("Pet.") at 5 (Docket # 1). McCullough states that "[r]egardless of the number of the times during which observation occurs, it cannot be said that a witness would be immune to police suggestion." *Id.* Essentially, McCullough claims that Timmons was subjected a suggestive photo array prior to trial which distorted her ability to make an in-court identification.

Pursuant to New York Criminal Procedure Law ("N.Y.Crim.Proc.Law") § 710.30, the prosecution notified McCullough that Timmons, along with two of his co-defendants, Chislum and Latson, had identified him in a photo array. At the suppression hearing, Officer Sheridan testified that he presented the array, which contained six photographs of black males with similar physical characteristics, to Timmons and asked her if she recognized anyone. Officer Sheridan indicated that Timmons promptly pointed to McCullough's photograph and stated that he was the person she knew as "Chunky" who participated in the assault on Dukes. The trial court denied McCullough's motion to suppress the identifications, holding that the identification procedures were not unduly suggestive. On direct appeal, the

court agreed, holding that "the viewer's attention [was] not drawn to defendant's photo in such a way as to indicate that the police were urging a particular selection." *People v. McCullough*, 278 A.D.2d at 915, 718 N.Y.S.2d 526 (citations and internal quotation marks omitted). I note that the prosecution did not introduce evidence at trial that Timmons had identified McCullough in a pre-trial photographic array, but rather relied on the in-court identification.

■ "Identification testimony will be suppressed only if it is determined, first, that the pretrial identification was unduly suggestive, and, second, that the suggestiveness rendered the subsequent identification at trial so unreliable as to require its exclusion from evidence." *United States v. Nersesian*, 824 F.2d 1294, 1319 (2d Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987) (citing *United States v. Leonardi*, 623 F.2d 746, 754 (2d Cir.), *cert. denied*, 447 U.S. 928, 100 S.Ct. 3027, 65 L.Ed.2d 1123 (1980)). The reviewing court must make its determination of reliability based upon " 'the totality of the circumstances, including the suggestive procedure used by the police.' " *Nersesian*, 824 F.2d at 1319 (quoting *Styers v. Smith*, 659 F.2d 293, 299 (2d Cir.1981)).

■ As both the trial court and the Appellate Division found, the pre-trial photographic array was not impermissibly suggestive. Moreover, after applying the relevant factors set forth in *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), for assessing the reliability of identification evidence, it is apparent that Timmons's identification of McCullough was reliable independent of the pretrial procedures. This was not a case where Timmons identified an unknown assailant after only a fleeting glimpse during the crime. Timmons testified that she had known McCullough, a

friend of her brother, as "Chunky" for "a few years," T.399, and McCullough testified that he had known Timmons for "[q]uite a while," T.873. Moreover, there is nothing improper about Timmons's identification of McCullough by his street name, "Chunky." *Cf., e.g., People v. Haddock*, 174 A.D.2d 773, 774, 570 N.Y.S.2d 719 (3d Dept.1991) (defendant's name not relevant to identification where witness, who had seen defendant in the Village a number of times and had previously purchased cocaine from him on several occasions, unhesitatingly identified defendant in court as the seller). I note that McCullough's contention that Timmons did not know him by a "proper" name is undercut by the fact defense counsel addressed McCullough as "Chunk" during trial. T.892.

Viewing the totality of the circumstances surrounding the in-court identification, I cannot say that there was such a substantial likelihood of misidentification that Timmons's in-court identification should have been suppressed. Therefore, the Appellate Division's rejection of this claim was neither "contrary to," nor an "unreasonable application of," governing Supreme Court precedent.

## B. Failure to serve prior notice of identification

McCullough alleges that the trial court erred in permitting an in-court identification of him for which the prosecution failed to serve prior notice pursuant to N.Y.Crim. Proc. Law § 710.30. Several days into the trial, the prosecutor informed the court and defense counsel that Roman and Bermudez had told her the previous day that they had observed a photograph of McCullough at the police station when they were interviewed at the time of the incident. However, the People's N.Y.Crim. Proc. Law § 710.30 notice did not indicate that Roman and Bermudez

had identified McCullough in a pre-trial identification procedure. At the time the issue arose, Bermudez already had testified and made an in-court identification of McCullough. Roman had not yet testified.

In a hearing conducted outside the presence of the jury, Bermudez testified that she observed a color photograph of McCullough in a six-person array, T.626, while Roman testified that the photograph she saw of McCullough was black-and-white and appeared in an "album" with many pages, T.680, 683. Both women testified that they also were shown photographs of Latson.

However, the testimony of Roman and Bermudez was at odds with that of the four officers who interviewed them at the police station. Officer Sheridan testified that he was in charge of meeting with Timmons, whom he showed a photo array of McCullough. Officer Sheridan explained that he had to take extra steps in compiling the McCullough photo array, because the only photograph available of McCullough was in black-and-white. Therefore, Officer Sheridan printed the rest of the pictures in black-and-white so as not to call attention to McCullough. T.639–40. Officer Sheridan indicated that he was the only officer who had possession of the McCullough photo array that night, and that he never gave it to any of the other investigating officers. He further stated that he never showed the McCullough photo array to Bermudez or Roman. T.642–43.

Officer Merklinger and Investigator Campione testified that they showed Bermudez the photo arrays of Williams and Chislum only, and that both of these arrays were in color. T.649, 653, 664. Because Roman was Puerto Rican and did not speak English well, Officer Montalvo, who spoke Spanish as a first language, assisted Investigator Campione in showing the Williams and Chislum photo arrays to her. T.666, 669, 724, 727–28. All four police officers who had contact with Bermudez and Roman testified that they never showed either of them a photograph of McCullough.

Moreover, Officer Sheridan testified that Bermudez could not have seen a color photograph of McCullough because there was only one photograph of him, and it was black-and-white. Furthermore, Officer Montalvo testified that the practice of showing "albums" of mug shots to witnesses, such as the kind allegedly seen by Roman, was discontinued by the department in 1989. T.670. The trial court credited the officers' testimony and concluded that Bermudez and Roman were mistaken and, in fact, had not been shown a photograph of McCullough by the police. T.737.

■ Finding "no reason to disturb the court's determination, which rested on the credibility of the witnesses and thus is entitled to great weight," the Appellate Division held on direct appeal that no notice under N.Y.Crim. Proc. Law § 710.30 was required since Bermudez and Roman had not participated in a pre-trial identification procedure with McCullough. *People v. McCullough*, 278 A.D.2d at 918, 718 N.Y.S.2d 526. On habeas review, this Court is bound to accept the state court's factual findings unless McCullough rebuts this presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

The Second Circuit has noted that Section 2254(e)(1)'s "presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility.'" *Harris v. Kuhlmann*, 346 F.3d 330, 350 (2d Cir.2003) (quoting *Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir.2003)). Thus, on habeas review, the trial court's decision to credit

the police officers' testimony that Bermudez and Roman were not shown photographic arrays of McCullough is entitled to substantial weight. McCullough has offered no evidence in rebuttal apart from his assertion that Bermudez and Roman "unequivocally stated that they had been shown photographs ... which voids [the] court identification." Pet. at 5 (Docket # 1). In essence, McCullough argues that Bermudez and Roman are more credible than the police officers. However, this contention, without more, is insufficient to overcome the presumption of correctness which I must accord the trial court's findings, which were fairly based upon the testimony presented and an assessment of the witnesses' veracity at the hearing. The Appellate Division's dismissal of this claim was neither "contrary to," nor an "unreasonable application of," governing Supreme Court precedent.

## C. Insufficiency of the evidence

■ McCullough asserts that the evidence against him was legally insufficient to support a conviction because the "critical witness [*i.e.*, Timmons] ... does not identify which of the shots actually hit [the] victim." Pet. at 6 (Docket # 1). McCullough also claims that the verdict was against the weight of the evidence.[5] *Id.* McCullough thus only appears to challenge the murder convictions as having been obtained upon insufficient evidence.

■ A habeas petitioner "challenging the sufficiency of the evidence bears a very heavy burden." *Einaugler v. Supreme Court,* 109 F.3d 836, 840 (2d Cir.1997) (quotation marks omitted). The reviewing court must uphold a state criminal conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. at 319, 99 S.Ct. 2781 (emphasis in original). McCullough must "rebut ... the presumption that all factual determinations made by the state court were correct." *Ponnapula v. Spitzer,* 297 F.3d 172, 176 (2d Cir.2002); *see also* 28 U.S.C. § 2254(e)(1). In making this assessment, a court may not "disturb the jury's findings with respect to the witnesses' credibility." *United States v. Roman,* 870 F.2d 65, 71 (2d Cir.1989). Thus, under this rigorous standard, a Federal habeas court " 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' " *Wheel v. Robinson,* 34 F.3d 60, 66 (2d Cir.1994) (quoting *Jackson,* 443 U.S. at 326, 99 S.Ct. 2781).

5. Contrary to respondent's contention, an insufficiency of the evidence argument does raise a Federal constitutional claim. The Supreme Court explained in *Jackson v. Virginia,* 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), that "[*In re*] *Winship* [, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970),] presupposes as an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." However, challenges to the weight of the evidence supporting a conviction, unlike challenges to the sufficiency of the evidence, are not cognizable on federal habeas review. *Maldonado v. Scully,* 86 F.3d 32, 35 (2d Cir.1996). In contrast to the intermediate appellate courts in New York State, the Federal courts may not independently "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony." *People v. Bleakley,* 69 N.Y.2d 490, 495, 515 N.Y.S.2d 761, 508 N.E.2d 672 (1987). Therefore, McCullough's weight-of-the-evidence claim is dismissed as not cognizable on habeas review.

■ With regard to the felony murder charge, the issue is whether Dukes was killed during the course or commission of the robbery. *See* N.Y. Penal Law § 125.25(3). The circumstances of the shooting and the medical evidence adduced by the coroner leave no room for doubt that Dukes died of a gunshot wound to the chest inflicted at close range. The trial testimony revealed that Chislum, the shooter, was standing close to Dukes when he fired the shot gun, that the gun was pointed directly at Dukes, and that Dukes fell to the ground after the shot. Indeed, Timmons provided graphic testimony on this point. Asked whether the first shot struck Dukes, Timmons answered, "Ain't [*sic*] no way that the gun, when it went off, couldn't have hit him." T.479. Timmons added, "they was [*sic*] standing face to face and the gun was pointed dead at him." T.479. Timmons's observations were consistent with the medical evidence which showed that the fatal shot was fired about three to seven feet from Dukes's chest. The medical examiner testified Dukes could have gotten to his feet and run from his attackers even after sustaining the chest wound that eventually caused his death. T.705.

■ The sufficiency of the evidence on the intentional murder charge presents a somewhat closer question. As McCullough points out, he did not fire the fatal shot. In fact, there was no evidence that he even possessed a weapon on the night of the shooting. However, three witnesses testified that they saw McCullough participate in the robbery and step away from Dukes upon Chislum's command just before Chislum shot Dukes. Pass testified that she saw four men chase Dukes through her backyard after the first shot was fired. She did not specifically identify McCullough, but there was no evidence presented to disprove that four men par-

ticipated in the robbery. Thus, a rational jury could infer that McCullough was one of the four men chasing Dukes after he was shot.

The Court notes that defense counsel elicited from several of the key witnesses, such as Roman and Bermudez, inconsistencies in their various accounts of the shooting. For instance, Bermudez told the police and defense investigators that she did not know who the fourth perpetrator was, and, in fact, that he did not take part in the actual assault. However, at trial, she testified that those earlier statements were false and that McCullough, whom she knew as "Chunky," actively participated in the assault on Dukes. T.527–32.

■ Here, the jury chose to credit the prosecution witnesses' testimony and convict McCullough despite the inconsistencies in their testimony. The jury is exclusively responsible for determining the credibility of a witness, and a habeas court may not revisit the fact-finder's credibility determinations. *Marshall v. Lonberger*, 459 U.S. 422, 432–35, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983); *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir.1993); *Simpson v. Portuondo*, 2001 WL 830946, at *8 (S.D.N.Y. July 12, 2001). A reviewing court may not " 'reassess the fact specific credibility judgments by juries or . . . weigh conflicting testimony.' " *Vera v. Hanslmaier*, 928 F.Supp. 278, 284 (S.D.N.Y.1996) (quoting *Anderson v. Senkowski*, 1992 WL 225576, at *3 (E.D.N.Y. Sept.3, 1992)). On collateral review, the court " 'must presume that the jury resolved any questions of credibility in favor of the prosecution.' " *Id.*

Viewing the evidence and drawing all inferences in favor of the prosecution, a rational trier of fact could have found the requisite intent on the part of McCullough to commit the crime of intentional murder. Even if McCullough did not know that

Chislum intended to kill Dukes before the four young men all went over to 18 Maria Street, he certainly was aware of Chislum's intent once Chislum directed his cohorts to step away from Dukes and then fired the shotgun at Dukes at point-blank range.

In sum, the jury's decision primarily was a matter of choosing whether to believe McCullough's version of events or to believe the version offered by the prosecution. The jury chose to believe the prosecution's witnesses, and this Court cannot say that on all the evidence presented no rational jury could have found guilt beyond a reasonable doubt. *See Gruttola v. Hammock*, 639 F.2d 922, 928 (2d Cir.1981); *see also Carromero v. Strack*, 1998 WL 849321, at *5 (S.D.N.Y. Nov.19, 1998) (evidence sufficient where jury credited prosecution witnesses' testimony "despite some inconsistencies between their trial testimony and prior statements to the police and to the grand jury"). Accordingly, the Appellate Division's dismissal of this claim was neither "contrary to," nor an "unreasonable application of," governing Supreme Court precedent.

### D. Abuse of discretion in admitting photograph of victim

■ McCullough argues that the trial court erred in permitting the jury to view a photograph of Dukes's body taken at the medical examiner's officer because "there is no disputed or material issue which is proven or disproven [*sic*] by the medical examiner's photograph." Pet. at 6 (Docket # 1). On direct appeal, the Fourth Department held that it was not an abuse of discretion to admit the photograph since it was relevant to the issues of causation and intent. *People v. McCullough*, 278 A.D.2d at 916, 718 N.Y.S.2d 526.

■ Under New York law, the trial court judge has broad discretion in deter-

mining the admissibility of photographs. Demonstrative or physical evidence is generally admissible if, for instance, "it tends to prove or disprove a disputed or material issue." *People v. Pobliner*, 32 N.Y.2d 356, 369, 345 N.Y.S.2d 482, 298 N.E.2d 637 (1973), *cert. denied*, 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 110 (1974) (citations omitted). Accordingly, photographs of homicide victims, even if "gruesome and … tend[ing] to arouse passion … against the defendant in the minds of the jury," *id.* at 369–70, 345 N.Y.S.2d 482, 298 N.E.2d 637, "should be excluded only if their sole purpose is to arouse the emotions of the jury and to prejudice the defendant," *id.* at 370, 345 N.Y.S.2d 482, 298 N.E.2d 637.

Here, the photograph of Dukes was relevant in that it was probative of the cause of death, an issue that was disputed at trial (defense counsel sought to show that Dukes's ingestion of cocaine and alcohol could have been the cause of death). Because the photograph illustrated that Dukes was shot at very close range, it tended to prove that Chislum intended to kill Dukes. It therefore was probative of the fact that the shooting was intentional, an essential element of one of the murder charges against McCullough. *See* N.Y. Penal Law § 125.25(1); *see also Rivera v. Scully*, 1993 WL 454209, at *4 (S.D.N.Y. Nov.2, 1993) (denying habeas claim based on admission of allegedly prejudicial photograph where it disproved petitioner's justification defense and reinforced proof of his intent by showing the extent of the beating which victim received at petitioner's hands), *aff'd*, 40 F.3d 1237 (2d Cir. 1994).

Permitting the jury to view the photographs of the murder victim, then, was not erroneous under state evidentiary principles. Nor did it violate McCullough's constitutional rights. "Where the prejudicial evidence is 'probative of [an] essential ele-

ment' in the case, its admission does not violate the defendant's right to due process." *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir.1998) (quoting *Estelle v. McGuire*, 502 U.S. 62, 69, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)). The Appellate Division's rejection of this claim was neither "contrary to," nor an "unreasonable application of" clearly established Federal law.

### E. Erroneous preclusion of co-defendant's hearsay statement

██ McCullough asserts that the trial court erred in precluding a hearsay statement allegedly made by his cohort, Chislum. Addendum to Pet., ¶ E (Docket # 1). According to McCullough, Chislum told Pass on the day after Dukes was killed that he did not intend to shoot Dukes. On cross-examination, defense counsel sought to question Pass on this topic, but the trial court sustained the prosecutor's hearsay objection. T.784–85. On direct appeal, the Appellate Division held that "[c]ontrary to defendant's contention, [Chislum's] statement did not constitute a declaration against penal interest" because "[t]here was no evidence that [Chislum] was aware that the statement was against his penal interest when [it] was made." *People v. McCullough*, 278 A.D.2d at 916, 718 N.Y.S.2d 526 (citing, *e.g., People v. Thomas*, 68 N.Y.2d 194, 197, 507 N.Y.S.2d 973, 500 N.E.2d 293 (1986), *cert. denied*, 480 U.S. 948, 107 S.Ct. 1609, 94 L.Ed.2d 794 (1987)); *see also* Fed.R.Evid. 804(3).[6]

Here, Pass already was aware of Chislum's involvement in Dukes's death, having seen him race through her yard carrying a shotgun moments before she heard two shots. Thus, Chislum's statement evidenced an attempt to minimize his culpability for the Dukes murder, removing it from the realm of declarations against penal interest. *Cf. United States v. Matthews*, 20 F.3d 538, 545 (2d Cir.1994) ("To the extent that the declarant's statement implicates another person in the crime, it may in some circumstances constitute an attempt to minimize the declarant's own culpability, or to shift blame to another, or to curry favor with authorities," making it inherently unreliable.). There was no error, much less error of constitutional magnitude, in the trial court's preclusion of this self-serving statement by Chislum. This claim does not warrant habeas relief.

### F. Refusal to charge attempted robbery as a lesser included offense

██ McCullough contends that the trial court erroneously declined to charge attempted robbery as a lesser included offense of robbery. Addendum to Pet., ¶ F, Dkt. # 1. This claim is not cognizable in a Federal habeas proceeding because it does not implicate a Federal constitutional right. *See Estelle v. McGuire*, 502 U.S. 62, 71–72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Neither the Supreme Court nor the Second Circuit has held that a court's failure to instruct a jury on lesser included offenses in a non-capital case is a constitutional issue that may be considered in a habeas petition. *Knapp v. Leonardo*, 46 F.3d 170, 179 (2d Cir.1995); *accord Jones v. Hoffman*, 86 F.3d 46, 48 (2d Cir.1996) (*per curiam* ); *see also Parks v. People*,

---

6. Rule 804(3) of the Federal Rules of Evidence exempts from hearsay status any "statement which ... so far tended to subject the declarant to ... criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Fed.R.Evid. 804(3). Furthermore, a "statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." *Id.*

2003 WL 1396440, at *1 (S.D.N.Y. Mar.19, 2003). This claim accordingly is dismissed as not cognizable on habeas review.

### G. Improper limitation of defendant's right to cross-examination

■ McCullough asserts that the trial court erred in precluding defense counsel from asking prosecution witness Timmons whether she had received "in-patient treatment" for her cocaine dependency since the date of the crime. Addendum to Pet., ¶ G (Docket # 1). He also claims that the trial court improperly curtailed defense counsel's cross-examination of Timmons, Bermudez and Roman regarding their "prior bad acts . . . which involved potential family court proceedings and neglect." *Id.*

Respondent argues that this claim raises no constitutional issue because a determination of whether cross-examination was improperly curtailed is based upon state law. This contention ignores basic Confrontation Clause jurisprudence and is incorrect. "The Sixth Amendment of the Constitution guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.'" *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (reversing conviction where state court's evaluation of the adequacy of the scope of cross-examination ran afoul of the Confrontation Clause); *see also Cotto v. Herbert,* 331 F.3d 217, 256–57 (2d Cir.2003) (finding that state trial court's error in precluding cross-examination of witness whose out-of-court identification of petitioner was admitted at trial through testimony of police officers, in violation of Confrontation Clause, was not harmless, thus warranting federal habeas relief). One of the primary interests secured by the Confrontation Clause is the right of cross-examination. As the Supreme Court has noted, "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Id.* at 316, 94 S.Ct. 1105.

■ Here, McCullough's rights under the Confrontation Clause were not abridged during the cross-examination of Timmons. The transcript reveals that defense counsel was permitted wide latitude in questioning Timmons about her drug use. Not only did defense counsel elicit from Timmons that she had been on a three-day crack binge prior to witnessing the shooting, he brought out the fact that she had smoked a fair amount of cocaine the night before she testified at trial. This testimony was more than sufficient to apprise the jury that Timmons had a very serious drug problem. Any testimony from Timmons as to whether she sought treatment for her drug addiction would not have tended to impeach her believability as a witness. Rather, it is very possible that the jury might have viewed her more favorably had it heard of her attempts to overcome her drug dependency. There was no error in the trial court's restricting cross-examination on this collateral matter.

McCullough also claims that defense counsel improperly was precluded from asking Timmons, Roman, and Bermudez whether they were adjudicated in family court proceedings to have neglected their children. Their fitness as mothers, however, was irrelevant to the issues sought to be determined at trial. Furthermore, as the trial court observed, a neglect proceeding in family court is not a criminal action, and the records are sealed.

In any event, the court allowed testimony from Timmons and Bermudez that their children did not reside with them, and the jury heard that all of the women had serious drug problems. The jury thus was adequately advised that the prosecution witnesses left much to be desired as par-

ents, and McCullough's right of cross-examination was not unconstitutionally impaired.

## H. Denial of the defendant's request to have jury view the crime scene

McCullough asserts that "the contentions of the defendant that he was off to the side by bushes was essential to his claim that he was a bystander and not a participant." Addendum to Pet., ¶ H (Docket # 1). According to McCullough, it was necessary for the jury to observe the front porch and yard of 18 Maria Street in order to determine this issue. The Appellate Division found on direct appeal that the trial court did not abuse its discretion in denying defendant's request to have the jury visit the crime scene, finding that "[p]hotographs were admitted in evidence and sufficiently depicted the crime scene." *People v. McCullough,* 278 A.D.2d at 916, 718 N.Y.S.2d 526.

 This argument presents an issue of state evidentiary law which generally is not amenable to federal habeas review. *See Estelle v. McGuire,* 502 U.S. at 71–72, 112 S.Ct. 475. As the trial court and the Appellate Division noted, the jury was shown photographs of the crime scene which depicted the location where Dukes was killed. The jury would not have been able to determine, just by visiting the house at 18 Maria Street, whether McCullough in fact had been standing passively by the bushes in the front yard as he claimed. More relevant to such a determination was an assessment of McCullough's credibility, which, in this case, required no visit to the crime scene. Thus, McCullough was not deprived of a fundamentally fair trial due to the judge's denial of his request to have the view the crime scene. *See Fowler v. Kelly,* 104 F.3d 350 (Table), 1996 WL 521454, at *3 (2d Cir. Sept.16, 1996) (trial court's denial of request to

have jury view crime scene did not violate right to fair trial; jury had before it photographs of the crime scene and its layout as well as detailed witness testimony describing its dimensions) (unpublished opinion).

## I. Erroneous admission of testimony regarding witness intimidation

McCullough argues that the trial court erred in allowing Timmons to testify about alleged threats made to her by Chislum's friend, Damien Smith, concerning her testimony. Addendum to Pet., ¶ I (Docket # 1). On direct appeal, the Appellate Division held that

[t]he trial court properly permitted a prosecution witness to testify that she had been intimidated by the friend of a co-defendant. Defendant opened the door to that testimony by questioning the witness with respect to an inconsistent statement, and the prosecution had the right on redirect to rehabilitate that witness by explaining to the jury the relevant surrounding circumstances.

*People v. McCullough,* 278 A.D.2d at 917, 718 N.Y.S.2d 526 (quotations and citations omitted).

 Under New York law, "where ... the opposing party 'opens the door' on cross-examination to matters not touched upon during the direct examination, a party has the right on redirect 'to explain, clarify and fully elicit [the] question only partially examined' on cross-examination." *People v. Melendez,* 55 N.Y.2d 445, 451, 449 N.Y.S.2d 946, 434 N.E.2d 1324 (1982) (citations omitted). The Court of Appeals in *Melendez* explained that the "opening of the door" theory has been recognized in a variety of situations. For instance, "apparent inconsistencies or contradictions in a witness' statements or acts brought out on cross-examination to discredit his testimony may be reconciled on redirect by

relating to the jury the relevant surrounding circumstances." *Id.*

Similarly, the Second Circuit has observed that counsel may use redirect "to rebut false impressions arising from cross-examination and the trial judge is in the best position to determine whether such a false impression was created." *United States v. Diaz*, 176 F.3d 52, 80 (2d Cir.) (upholding the admission of redirect testimony that witness received money from the government to flee because she feared defendant, because defendant "opened the door for the government's redirect by creating an impression that [the witness] was being paid for her testimony and that the government was subsidizing her alleged 'vacation'") (internal quotations and citations omitted), *cert. denied,* 528 U.S. 875, 120 S.Ct. 181, 120 S.Ct. 314, 315, 145 L.Ed.2d 153 (1999); *see also, e.g., United States v. Vasquez*, 267 F.3d 79, 83–85 (2d Cir.2001) (defense counsel's cross-examination regarding witness's possession of a gun "opened the door" for the prosecution's elicitation of testimony on redirect that witness armed himself because defendant had a "reputation" for killing people), *cert. denied,* 534 U.S. 1148, 122 S.Ct. 1111, 151 L.Ed.2d 1005 (2002). "The scope of redirect examination is a matter entrusted to a trial judge's broad discretion." *United States v. Diaz*, 176 F.3d at 80 (citing *United States v. Wiley*, 846 F.2d 150, 156 (2d Cir.1988)).

■ Here, defense counsel aggressively cross-examined Timmons about the inconsistencies in her statements, bringing to light the fact that the statement she gave to investigators on December 28, 1994, was in direct conflict with a previous statement to police given November 22, 1994, as well as with her trial testimony. In Timmons's December 28th statement to police, she stated that at the time of the shooting, "Deke [Chislum] was still holding the gun and it went off." She also indicated that "[t]he gun was not pointed at [Dukes] and there was no way it could have hit him." Timmons further stated that she was "very drunk" at the time of the shooting and when the police took her statement on November 22, 1994. T. 454–55. On redirect, Timmons explained that Damien Smith ("Smith"), who lived with her and whom she considered to be her nephew, told her to "change" her first statement to police otherwise he was going to "do something" to her. T.478. Smith told her that if she claimed to have been high when she gave the first statement, it would not be used in court. T.479.

Defense counsel's cross-examination thus provided the jury with only part of the story and left it with the impression that Timmons was a liar. In such case, the prosecutor was entitled to seek to rehabilitate Timmons by explaining the circumstances under which she was impelled to make the false statements at issue.

■ Whether under state or federal rules of evidence, the balancing of the prejudicial effect of certain evidence against its probative value is left to the sound discretion of the trial judge. *See, e.g., United States v. George*, 266 F.3d 52, 63 (2d Cir.2001) (noting that the trial judge "is obviously in the best position to do the balancing mandated by Rule 403" and accordingly, has "'broad discretion' … to admit or exclude evidence pursuant to Rule 403.") (citations omitted); *People v. Sandoval*, 34 N.Y.2d 371, 375, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974). Here, the trial judge and the Fourth Department did not err in exercising their discretion, and hence did not violate any state evidentiary rule, much less any Federal constitutional right.

■ Nevertheless, even if permitting such testimony was erroneous as a matter

of state law, which this Court expressly finds not to be the case, McCullough was not deprived of a fundamentally fair trial as a result. The statement which Timmons subsequently claimed was the product of threats did not mention McCullough, and Timmons never indicated that McCullough was involved in the intimidation of her. Moreover, the evidence against McCullough was substantial. Under these circumstances, there is no reasonable probability that the outcome of the trial would have been different had the evidence not been admitted. This claim does not warrant habeas relief.

**J. Harsh and excessive sentence**

McCullough contends that his sentence was unduly harsh and excessive, given his "low intelligence," his lack of prior convictions, and the fact that he "had little, if anything to do with ... the shooting itself." Addendum to Pet., ¶ J (Docket # 1). On direct appeal, the Fourth Department held that his sentence was "neither unduly harsh nor severe." *People v. McCullough,* 278 A.D.2d at 918, 718 N.Y.S.2d 526.

■ A petitioner's assertion that a sentencing judge abused his discretion in sentencing is generally not a federal claim subject to review by a habeas court. *See Fielding v. LeFevre,* 548 F.2d 1102, 1109 (2d Cir.1977) (citing *Townsend v. Burke,* 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948)). A challenge to the term of a sentence does not present a cognizable constitutional issue if the sentence falls within the statutory range. *White v. Keane,* 969 F.2d 1381, 1383 (2d Cir.1992). McCullough's sentence was within statutory limits and further review is therefore barred.

**K. Limitation of direct examination of defendant**

McCullough claims that the trial court improperly precluded defense counsel from questioning him as to what thoughts passed through his mind at the time of the shooting. Addendum to Pet., ¶ K (Docket # 1). On direct appeal, the Fourth Department held that the court

> erred in limiting the scope of defendant's direct examination by refusing to allow defendant to respond to a question concerning "what thoughts were running through [defendant's] mind" at the time the victim was shot by a codefendant. That question was proper because, "where an actor's state of mind is a material issue, the actor is allowed to testify concerning such issue." Defendant was convicted of intentional murder as an accomplice, and thus the jury had to find that he acted "with the mental culpability required for the commission of that offense" (Penal Law § 20.00). We conclude, however, that the error is harmless. The jury was otherwise informed, through defendant's written statement and testimony, that defendant claimed to be an innocent bystander who did not share the intent of his codefendants.

*People v. McCullough,* 278 A.D.2d at 917, 718 N.Y.S.2d 526 (some citations omitted) (alteration in original).

■ Federal habeas corpus relief will not issue to rectify errors of state evidentiary law unless a Federal constitutional issue is also presented. *See Estelle v. McGuire,* 502 U.S. at 67–68, 112 S.Ct. 475 (a Federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States;" it is not the province of a Federal habeas court to reexamine state court determinations of state law). Whether the exclusion of testimony violated a defendant's right to present a defense depends upon whether " 'the omitted evidence [evaluated in the context of the en-

tire record] creates a reasonable doubt that did not otherwise exist.'" *Justice v. Hoke,* 90 F.3d 43, 47 (2d Cir.1996) (quoting *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)); *accord, e.g., Jones v. Stinson,* 229 F.3d 112, 120 (2d Cir.2000). "In a close case, 'additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.'" *Jones,* 229 F.3d at 120 (quoting *Agurs,* 427 U.S. at 112, 96 S.Ct. 2392).

On habeas review, trial errors are subject to lenient harmless error review. *Id.* (citing *Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)) (requiring "substantial and injurious effect or influence in determining the jury's verdict") (internal quotation marks omitted). The Supreme Court has held that the creation of reasonable doubt that otherwise would not exist satisfies the "substantial and injurious" standard. *Id.* (citing *Kyles v. Whitley,* 514 U.S. 419, 436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)) ("*Agurs* ... opted for its formulation of materiality ... only after expressly noting that this standard would recognize reversible constitutional error only when the harm to the defendant was greater than the harm sufficient for reversal under *Kotteakos* [*v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) ] [the standard adopted by *Brecht* ].").

This Court agrees that the trial judge erred in precluding McCullough from testifying as to his intent. *See United States v. Kyle,* 257 F.2d 559, 563 (2d Cir.1958) (where defendant was charged with fraud, evidence of his intent by direct testimony on his part as to his belief and motive was material; such evidence if believed by the jury might tend to repel the inferences of fraudulent intent revealed by his activities), *cert. denied,* 358 U.S. 927, 79 S.Ct. 312, 3 L.Ed.2d 301 (1959); *accord, e.g.,*

*Vinieris v. Byzantine Maritime Corp.,* 731 F.2d 1061, 1064 (2d Cir.1984) (where cause of action under penalty statute required a showing of "conscious misconduct" on the part of the defendant's ship's captain, testimony by him "as to his beliefs, motives, and intent was material and admissible").

Viewing the record as a whole, however, the Court cannot conclude that the introduction of further evidence as to McCullough's state of mind would have created new reasonable doubt. McCullough testified that he did not know that Chislum intended to rob Dukes, and that he did not know what Chislum was going to do with the gun. T.889. The jury naturally would have inferred from that testimony that McCullough would testify that he did not share Chislum's intent to kill Dukes. McCullough also stated that he remained on the sidewalk behind the bushes during the incident and did not watch the attack. T.890. Additionally, the jury heard McCullough's statement to the police in which he claimed that he did not participate in the robbery and told Chislum to "chill" after he shot Dukes.

Thus, the jury had sufficient evidence before it concerning McCullough's state of mind, and further evidence as to his intent would not have created in the jurors' minds an otherwise non-existent reasonable doubt. I cannot find that the Appellate Division was objectively unreasonable in holding that the trial judge's erroneous preclusion of evidence as to McCullough's intent was harmless.

**L. Improper cross-examination as to oral statements by defendant to police**

McCullough claims that the trial court erroneously allowed the introduction of certain oral statements made by him to the police, despite the fact that the prosecution failed to provide notice pursuant to

N.Y.Crim. Proc. Law § 710.30.[7] Addendum to Pet., ¶ L (Docket # 1). During the prosecutor's cross-examination of McCullough, she approached the bench and stated that she intended to question McCullough about oral statements made to the police after his arrest, including statements about having been home with his mother on the night in question. T.886. Defense counsel conceded to the proposed use of the statements. T.886.

The Appellate Division held that because defense counsel failed to object at trial, the issue was not preserved for review. *People v. McCullough,* 278 A.D.2d at 915, 718 N.Y.S.2d 526. However, the court went on to consider the substance of the claim and held that, in any event, it lacked merit "because a CPL 710.30 notice is not required where the prosecution uses a defendant's statements solely for impeachment purposes." *Id.* (citations omitted).

This claim must be dismissed as not cognizable on habeas review. An alleged violation of N.Y.Crim. Proc. Law § 710.30 involves the prosecution's claimed failure to comply with a State procedural rule. McCullough cites no authority for the proposition that such a claim presents an issue of constitutional magnitude, and indeed, this Court has uncovered none in its research. To the contrary, courts in this Circuit have held that an alleged violation of N.Y.Crim. Proc. Law § 710.30 is not cognizable on habeas review. *See James v. Senkowski,* 1998 WL 217903, at *6 (S.D.N.Y. Apr.29, 1998); *Pacyon v. New York State Parole,* 1996 WL 528812, at *2 (W.D.N.Y. Sept.3, 1996) (petitioner's § 710.30 claim "fails to state a claim of a

constitutional magnitude"); *Roberts v. Scully,* 875 F.Supp. 182, 191 (S.D.N.Y. 1995); *Brown v. Harris,* 666 F.2d 782, 785 (2d Cir.1981) ("Brown cites no case indicating that this statute, or that a notice requirement in general, is constitutionally mandated."), *cert. denied,* 456 U.S. 948, 102 S.Ct. 2017, 72 L.Ed.2d 472 (1982). Moreover, as the Appellate Division observed, there was no error under State law because the prosecution may introduce a prior oral statement by a defendant to the police without providing § 710.30 notice if it is used merely to impeach his testimony, as was the case here. *See People v. Sanzotta,* 191 A.D.2d 1032, 595 N.Y.S.2d 152, 153 (4th Dept.1993) (N.Y.Crim. Proc. Law § 710.30 notice not required where previously undisclosed statement made to police is used to impeach defendant).

## CONCLUSION

For the reasons stated above, Gerome McCullough's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because McCullough has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED.**

---

**7.** Section 710.30(1)(b) provides as follows:
Whenever the people intend to offer at a trial ... (b) testimony regarding an observation of the defendant either at the time or place of the commission of the offense or upon some other occasion relevant to the

case, to be given by a witness who has previously identified him as such, they must serve upon the defendant a notice of such intention, specifying the evidence intended to be offered. N.Y.Crim. Proc. Law § 710.30(1)(b).