Breitel, J.
Defendant appeals from a conviction for the murder of his wife and the denial of his postconviction motion to vacate the judgment.
A primary issue is whether intercepted telephone conversations between defendant and his lawyers before he was indicted, so invaded the counsels of the defense that a dismissal of the indictment is required. A related issue is whether defendant’s trial attorney intentionally waived a hearing on the legality and effect of the wiretap, and waived objection to the alleged, but disputed, use by the prosecutor of wiretap information on cross-examination of the principal defense witness. Other contentions turn on the admission into evidence of blown-up photographs of the blood-stained corpse, and testimony about defendant’s extramarital sexual relations. Defendant also contends that the trial court erred in denying, without a hearing, his motion to vacate the judgment based on newly-discovered evidence.
There should be an affirmance. Although the interception of the lawyer-client telephone conversations was grossly improper, the counsels of the defense were not so invaded that the indictment should be dismissed. On the related issue whether improperly obtained wiretap evidence was used indirectly by the prosecution, the court properly found that there was no such use. In that connection, defendant either had a hearing during trial or waived his right to a hearing, in seeking to establish such indirect use. The remaining issues raised do not reveal error in the trial.
*361 On December 27,1968, the bloody corpse of Brenda Pobliner was found in a sleeping position in the marital bed, with three clustered bullet wounds near her left temple. Brenda and her husband, defendant Jay Pobliner, had lived with their 15-month-old son in Merrick, Long Island. It was a second marriage for each. The evening before the murder, Jay had brought home a male friend, lilis Jurisson. The three apparently spent a quiet evening having a couple of drinks and watching television. According to Joe Hall, a friend of Jay’s from North Carolina, Jay admitted to him that, while she slept, he shot his wife with a pistol in the presence of Jurisson the following morning. That morning Jay fed a bottle to the couple’s 15-month-old boy, and then drove Jurisson to Manhattan. Defendant had breakfast with his parents in Manhattan and then went to work in a family business arranging travel tours.
After arriving at work, he called his wife, and receiving no answer, called a neighbor, a Mrs. Pober. Mrs. Pober discovered the body, telephoned the police, and then her husband to ask him to call Jay and tell him something was wrong. She did not tell her husband what was wrong with Brenda and did not say anything about blood. Her husband called defendant and told him only that something was wrong and to come home. Defendant then spoke to the men where his automobile was parked, asking for someone to drive him to his home because he was too nervous to drive. He told them that his wife was “bleeding ”. The prosecution relied heavily on Jay’s “ guilty knowledge ” of the bleeding and his detailed admissions to Joe Hall. Although the murder weapon was never recovered, the prosecution established defendant’s prior purchase of an unregistered pistol through Joe Hall, which could have been the weapon used. The defense relied primarily on the alibi testimony of Jurisson.
Immediately after the murder, defendant Jay and Jurisson apparently co-operated with the police investigation. Both were questioned at length, and gave exculpatory signed statements. Lie detector and paraffin tests were performed and Jay’s clothes were scientifically examined. The results of these tests were evidently unproductive.
After the murder, Jay and his child stayed with his parents in their Manhattan apartment. The police, concentrating their *362 investigation on Jay, but, as the District Attorney’s brief states, ‘ ‘ Having run into a stone wall ’ ’, obtained two judicial eavesdropping orders for two telephones in the parents’ apartment. All telephone conversations were recorded from about January 16, 1969 to February 5, 1969.
On March 24, 1969, Joe Hall, who had. asked to speak to someone in the District Attorney’s office, revealed Jay’s admissions to him. Jay was indicted March 28, 1969.
The transcript of recorded conversations contains 1,338 pages. Eleven conversations were recorded between J ay and a lawyer-friend, one Handman; ten conversations between one of Jay’s parents and Handman; eight between Jay and his private investigator; and three between Jay’s parents and the investigator. One conversation between Jay and his trial attorney was reflected in the detective’s notes but was not recorded in the transcript. There was one recorded conversation between Jay and the trial attorney’s law partner.
Much of the recorded conversations were concerned with the progress of police investigations, defendant’s plans for investigation, or were simply to arrange conferences among Jay, his lawyers, and investigator. There were discussions of possible witnesses, including Jurisson, and of Jay’s plans to visit Asheville, North Carolina.
Some conversation between Jay and his lawyer-friend involved treatment of Jurisson’s mental condition. The District Attorney asserts that by getting Jurisson admitted to a private hospital for shock treatments, Jay and his lawyer were intentionally destroying material evidence. The District Attorney, therefore, argues that the conversations involved commission of a crime which would not be covered by any confidential privilege. The conversations between Jay and his lawyer show that they arranged for Jurisson’s admission to the hospital; that they fretted about what Jurisson might say to the police; and that Jay’s family paid a Jurisson hospital bill of $900.
At the preliminary hearing (prior to the first trial which ended in a mistrial) defendant’s trial attorney moved for a hearing on the validity of the wiretap, citing the invasion of the lawyer-client conversations. The prosecutor advised the court that no wiretap evidence and no evidence discovered as a result of the tap would be used on the People’s direct case. On that *363 representation, the court ruled that it would not permit use of the wiretaps, either directly or indirectly. Mr. Edelbaum, the trial attorney, however, who had listened to the tapes, was advised to object during trial to the introduction of evidence, if ascribed by him to the wiretaps. At the first and second trials, Edelbaum also moved to dismiss the indictment, because of the invasion of ‘ ‘ privacy between attorney and client ’ ’. The motion was denied. The prosecutor and the court agreed, nevertheless, that defendant was entitled to a hearing to explore the content of certain blank tapes and the circumstances of their erasure. Edelbaum first said he did not want such a hearing, and when it was offered again he reserved decision over the weekend, and apparently did not bring up the subject again.
At the second trial beginning September 8, 1970, Edelbaum asked whether and was informed that the court would make the same rulings on the wiretap evidence. After selection of the jury, the prosecutor suggested that since the validity of the wiretaps had never been determined, a hearing for that purpose should be held at the outset. Edelbaum objected strongly, requesting the court to adhere to its original decision which had the effect of denying the prosecution direct wiretap evidence or indirect evidence from wiretap leads. He also feared that the jury might be prejudiced by the delay. The court adhered to its original determination.
Defendant contends that the direct, intentional intrusion into defendant’s confidential relationship with his lawyers requires dismissal of the indictment. He cites no New York case which would support an outright dismissal of the indictment. He relies on the statement in Hoffa v. United States (385 U. S. 293) that “ [i]t is possible to imagine a case in which the prosecution might so pervasively insinuate itself into the councils of the defense as to make a new trial on the same charges impermissible under the Sixth Amendment” (at p. 308; see, also, United States v. Balistrieri, 403 P. 2d 472, 477-478 [7th Cir.], vacated 395 U. S. 710, appeal from determination on remand 436 F. 2d 1212, 1214-1215, cert. den. 402 U. S. 953; Caldwell v. United States, 205 F. 2d 879, 881, n. 11 [D. C. Cir.]).
Dismissal of the indictment is a drastic remedy, seldom employed, to sanction illegal seizure of evidence, as distinguished from the preclusion of illegal evidence. As the Supreme *364 Court stated in United States v. Blue, with respect to the privilege against self incrimination: “ [A defendant] would at most be entitled to suppress the evidence and its fruits if they were sought to be used against him at trial. While the general common-law practice is to admit evidence despite its illegal origins, this Court in a number of areas has recognized or developed exclusionary rules where evidence has been gained in violation of the accused’s rights under the Constitution, federal statutes, or federal rules of procedure. [Citations omitted.] Our numerous precedents ordering the exclusion of such illegally obtained evidence assume implicitly that the remedy does not extend to barring the prosecution altogether. So drastic a step might advance marginally some of the ends served by exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book.” (384 U. S. 251, 255 [per Harlan, J.]; see, also, United States v. Mancuso, 378 F. 2d 612, 617-618 [4th Cir.], cert. den. 390 U. S. 955).
Interference with the right to counsel may, nevertheless, as suggested in the Hoff a case, require dismissal of the indictment in an appropriate case (State v. Cory, 62 Wn. 2d 371). In the Cory case, defendant was charged with 12 counts of burglary and larceny. While in jail awaiting and during trial, defendant consulted with his attorney in a jail conference room. During trial it was discovered that a microphone had been placed in the conference room and the Sheriff and his officers had been listening to the privileged conversations. In dismissing the indictment, the Washington high court stated: “ There is no way to isolate the prejudice resulting from an eavesdropping activity, such as this. If the prosecution gained information which aided it in the preparation of its case, that information would be as available in the second trial as in the first. If the defendant’s right to private consultation has been interfered with once, that interference is as applicable to a second trial as to the first. And if the investigating officers and the prosecution know that the most severe consequence which can follow from their violation of one of the most valuable rights of a defendant, is that they will have to try the case twice, it can hardly be supposed that they will be .seriously deterred from indulging in this very simple *365 and convenient method of obtaining evidence and knowledge of the defendant’s trial strategy.”[1] (62 Wn. 2d, supra, at p. 377).
It would appear that it is not sufficient to justify dismissal of the indictment merely to show that attorney-client conversations were intercepted (see, e.g., People v. Morhouse, 21 N Y 2d 66, 77-78; Lanza v. New York State Joint Legislative Committee, 3 N Y 2d 92, 98; People v. Cooper, 307 N. Y. 253, 259-260; O’Brien v. United States, 386 U. S. 345; Black v. United States, 385 U. S. 26). It must be shown that the interception undermined the right to counsel and that the interference could not be cured by holding a new trial. In other words, it must appear to warrant dismissal, as distinguished from the limited sanction of exclusion of evidence, that the prosecution could or would necessarily avail itself of the illegal evidence directly or indirectly by way of strategy, or tactics, which it could not have but for the unlawful wiretap.
Concretely, defendant contends that intercepted privileged communications were used to cross-examine and impeach Jurisson, the key alibi witness for the defense. Otherwise, defendant does not suggest that any other use was made at the trial of privileged communications or that the improper interception in any other way affected the defense.
On direct examination, after giving the alibi testimony, Jurisson admitted having been in a hospital early in 1969 for about five weeks, although he had no memory of entering the hospital, and that he had received “ certain treatments”. On cross-examination Jurisson testified that defendant and his lawyer Handman had taken him to the hospital; that he had been given sedation and electrotherapy; and that defendant’s father had paid $900 of his medical expenses. No objection was made to this cross-examination.
*366 Defendant now argues that the information elicited on cross-examination was previously acquired by the prosecutor from intercepted, privileged communications. All of this information was, indeed, as noted earlier, available in the intercepted conversations. The District Attorney asserts, however, that the information was also available from independent sources. The opposing contentions should have been tested at trial, after a proper objection raising the issue. Because of the failure to object the issue is not preserved for appeal (CPL 470.05, subd. 2; e.g., People v. Rullo, 31 N Y 2d 894, 895; cf. People v. De Renzzio, 19 N Y 2d 45, 50; but cf. People v. McLucas, 15 N Y 2d 167, 172). As will he described in some detail defense counsel first agreed and then urged that the procedure to test the effect of the questioned tapes should be on a limited basis.
Defendant argues that even if the indictment should not he dismissed, there should at least he a reversal of the conviction and a direction to hold a hearing to determine the validity of the wiretap. Defendant cites various cases in which convictions were reversed, but all are distinguishable on the ground that at the time of trial, the wiretap of attorney-client conversations was not known by the court or the defense (e.g., O’Brien v. United States, 386 U. S. 345, supra; Black v. United States, 385 U. S. 26, supra).
In this case, the existence of the wiretap was of course known, and defense counsel had listened to the tapes. Two of the tapes were inaudible, but defense counsel, as stated above, declined the opportunity for a hearing to determine the circumstances of their erasure, offered at the first trial by the court and the prosecution. A hearing to determine the validity of the wiretap and the admissibility of recorded conversations was, as stated, requested and denied at the first trial on the representation by the prosecution that neither the conversations nor evidence derived from them would be introduced by the People on the direct case. The court followed a practice of holding a hearing during trial whenever evidence was challenged by the defense as based on wiretap conversations. Objections were made to the testimony of two damaging prosecution witnesses, Gaines and Hall. In this instance, a hearing was held out of the presence of the jury, and the court found by “clear and convincing” evidence that the police had a basis independent of the wiretap *367 for learning of their existence. Apparently, Gaines had inquired at defendant’s house the day of the homicide, and had employed defendant’s former maid; Hall’s name was listed in an address book of the deceased, and he was named by a local physician as someone the deceased feared.
The practice of holding wiretap hearings during trial was impliedly sanctioned in People v. Morhouse (21 N Y 2d 66, supra) where the court remitted a case for a hearing on “whether the People’s evidence on defendant’s trial was ‘ tainted ’ by * * * improper eavesdropping ”, but the conviction was not reversed (id., at p. 77). It was determined at the hearing on remittal that there was no “ taint ” and-the conviction was upheld (34 A D 2d 769, affd. 27 N Y 2d 896). In the instant case, where the prosecution had advised that it would not use the questioned wiretaps or evidence derived from them, hearings during the trial rather than one hearing at the outset were desirable as a practical matter. Because of the voluminous wiretap transcript, in order to effect the exclusion of evidence derived from the wiretap almost the entire case of the People would have to be disclosed to give the defense adequate opportunity to argue for suppression. It was as the prosecutor stated at trial “premature” and “a shot in the dark” to hold a hearing on possible “ taint ” at the outset.
In any event, regardless of what the proper or best procedure might be, when a full hearing was suggested by the prosecutor at the second trial, defendant’s attorney, a lawyer of many years’ experience at the criminal bar, strenuously opposed it. His argument to the trial court shows his concern that if there were a full hearing on the legality and effect of the wiretap, some of the wiretap evidence, already excluded with the prosecutor’s consent and by court order, might become admissible against his client. Under the circumstances, defendant waived any right he may have had to a full hearing on the wiretap issue.
Defendant also objects to the use of the “ clear and convincing ” standard of proof in the hearings on the objections to the testimony of Gaines and Hall. He argues that the beyond-a-reasonable-doubt test is required.
Although no case in New York has been found expressly laying dowm the proper standard of proof, the court in People v. Mendez (28 N Y 2d 94) appears to have applied a lower stand *368 ard than “ beyond a reasonable doubt”. The court allowed testimony of a witness who volunteered information to the police where “ [i]t seem[ed] reasonably clear that it was prob-v able or at least possible that lawful surveillance of the suspected defendant, without the information acquired by the wiretap, would have led the police to the witness in any event. ” (id., at p. 101). The standards applied in identification hearings on the issue of taint by prior suggestive “ show-up ” is “ clear and convincing evidence ” (People v. Ballott, 20 N Y 2d 600, 606; United States v. Wade, 388 U. S. 218, 240), but the voluntariness of a confession must be established “ beyond a reasonable doubt ” (People v. Huntley, 15 N Y 2d 72, 78).
There appears to be no impediment under the Federal Constitution to applying a lower standard of proof. Recently, in Lego v. Twomey (404 U. S. 477), the Supreme Court, contrary to the New York rule in this particular respect, held that voluntariness of confessions may be established “ by a preponderance of the evidence.” (id., at p. 489). The court stated its rationale: ‘‘ Without good cause, we are unwilling to expand currently applicable exclusionary rules by erecting additional barriers to placing truthful and probative evidence before state juries and by revising the standards applicable in collateral proceedings. Sound reason for moving further in this direction has not been offered here nor do we discern any at the present time. This is particularly true since the exclusionary rules are very much aimed at deterring lawless conduct by police and prosecution and it is very doubtful that escalating the prosecution’s burden of proof ip Fourth and Fifth Amendment suppression hearings would be sufficiently productive in this respect to outweigh the public interest in placing probative evidence before juries for the purpose of arriving at truthful decisions about guilt or innocence.” (404 U. S., supra, at pp. 488-489.) The same reasoning should apply in this case to questioned wiretaps. Moreover, it is very doubtful that intensifying the burden of proof beyond a showing by clear and convincing evidence would change the determination whether Gaines and Hall were discovered by the police from independent sources.
In summary, the wiretap of attorney-client conversations was highly improper, raising a difficult question whether the indict *369 ment should be dismissed.[2] In this instance, however, there was no showing that the interception affected the defense at trial in terms of trial strategy, questioning of witnesses, or introduction of evidence. The prosecutor agreed before trial that wiretap conversations would he excluded as would evidence derived from such conversations. Hearings during trial determined that the People’s evidence was not based on wiretap information, whenever experienced trial counsel made objection. Defendant has not sustained his attack on the standard of proof correctly used by the hearing court. Hearings on other points were expressly waived. In short, there is no showing that the defense on this trial was in any way affected by the improper interception, or that any purpose would be served by requiring another trial.
Defendant also contends that admission into evidence of large color photographs of Brenda Pobliner’s body in the bed where she was shot, and two taken at the morgue were improper and prejudicial. He argues that the detectives could have identified and described the position of the body avoiding the inflammatory impact on the jury.
The general rule is that photographs of the deceased are admissible if they tend to prove or disprove a disputed or material issue, to illustrate or elucidate other relevant evidence, or to corroborate or disprove some other evidence offered or to be offered (Ann., Evidence — Photograph of Corpse, 73 ALR 2d 769, 775-779; cf. People v. Webster, 139 N. Y. 73, 83; People v. Fish, 125 N. Y. 136, 147-148; People v. Lewis, 7 A D 2d 732). Admission of photographs of homicide victims is generally within the discretion of the trial court (Ann., Evidence—Photograph of Corpse, 73 ALR 2d 769, 780-782, supra; 3 Wharton’s Criminal Evidence [13th ed.], § 637, p. 281). Where they are qtherwise properly admitted as having a tendency to prove or disprove some material fact in issue, photographs of a corpse are admissible even though they ‘ ‘ portray a gruesome spectacle and may tend to arouse passion and resentment against the *370 defendant in the minds of the jury ” (Ann., Evidence — Photograph of Corpse, 73 ALR 2d 769, 787, supra; see 3 Wharton’s op. cit., supra, § 637, pp. 289-290; Richardson, Evidence [9th ed.], § 131; cf. People v. Singer, 300 N. Y. 120, 122). There are many cases in which photographs of a homicide victim have been held admissible to show, for example, the position of the victim’s body, the wounds of the victim, or to illustrate expert testimony (3 Wharton’s op. cit., supra, § 627, pp. 296-309, esp. cases cited in ns. 37, 39, and 51). Photographic evidence should be excluded only if its sole purpose is to arouse the emotions of the jury and to prejudice the defendant (see Ann., Evidence — Photograph of Corpse, 73 ALR 2d 769, 802-807, supra; cf. People v. Rial, 25 A D 2d 28, 30; People v. Lewis, 7 A D 2d 732, supra).
In the instant case, the theory of the prosecution was that defendant had killed his wife while she slept. Defendant had told Hall that Brenda “ was asleep when he shot her”. The defense was based on the assumption that a burglar had surprised Brenda in the bedroom and had shot her. Notably, defendant was a licensed possessor of a. variety of firearms.
The four photographs show, quite definitively, that the deceased was in her bed, in a sleeping position, when shot, thus tending to confirm Hall’s testimony. The two photographs taken at the morgue show the three clustered bullet holes near the left temple, indicating marksmanship and deliberateness in the killing. They also tend to complement other evidence accounting for the cartridges in a box purchased by the defendant. Under the circumstances, the pictures related to material issues in the case, and, therefore, were properly admitted. A 30-inch "x 40-inch blow-up of one of the photographs of the deceased in the bed was admitted in the trial court’s discretion to be used in connection with expert testimony.
Defendant also contends that it was improper and prejudicial to admit testimony of a woman friend that she had had sexual relations with the defendant. He argues that it was first necessary to show marital strife and a deep personal involvement with the paramour.
Suffice it to say that the jury would have been entitled to find a classic triangular relationship in this instance. During the fall and early winter before the killing, the paramour and defendant had relations on 10 to 12 occasions. She wás not *371 just a casual pick-up. Defendant introduced her to his son by his first marriage and at his place of employment. Defendant gave her a ring for her birthday and a watch for Christmas. The murder occurred two days after Christmas. That morning, after Mr. Pober called defendant at work but before he was driven home, he telephoned her. The jury was entitled to' consider whether this relationship motivated the murder. Certainly, it was relevant to show that defendant’s relationship with his wife was not a close affectionate one which might negate a motive to murder.
Finally, defendant contends that he was improperly denied a hearing on his motion to vacate in the nature of coram nobis. The motion was made on the ground of newly-discovered evidence. Defendant asserts that a Mrs. Pollack has been discovered who would testify that Mrs. Pober had admitted that she had told her husband that Brenda was bleeding.
No hearing on these allegations was required. On a prior motion for a new trial, defendant’s lawyer-friend had averred that “ Prior to and during the trial ” he had reported to trial counsel that a Mrs. Pollack was available to testify that Mrs. Pober had told her husband Brenda was [1] ‘ covered with blood and bleeding. ’ ’
Other alleged errors need no discussion.
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Fuld and Judges Burke, Jasen, Gabrielli, Jones and Wachtler concur.
Order affirmed.

. In a later case the same court, referring to the Cory case (supra), stated: “ Dismissal of charges is an extraordinary remedy. It is available only when there has been prejudice to the rights of the accused which materially affected the rights of the accused to a fair trial and that prejudice cannot be remedied by granting a new trial.” (State v. Baker, 78 Wn. 2d 327, 332-333). It should be observed, and indeed emphasized, that the requirement of prejudice shown relates to dismissal of the indictment for invasion of counsels of the defense. The preclusion of evidence obtained in any invasion of the client-lawyer privilege, is unqualified by any such requirement?

. This court and others have often condemned, without reservation, any intrusion into private communications between counsel and client (e.g., People v. Cooper, 307 N. Y. 253, 259; Matter of Fusco v. Moses, 304 N. Y. 424, 433; Glasser v. United States, 315 U. S. 60, 76; Coplon v. United States, 191 F. 2d 749, 760 [D. C. Cir.], cert. den. 342 U. S. 926).