[9 NE3d 870, 986 NYS2d 375]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CHERYL SANTIAGO, Appellant.

Argued January 15, 2014; decided February 25, 2014

742

## POINTS OF COUNSEL

*Malvina Nathanson*, New York City, for appellant. I. The conviction must be reversed for lack of corroboration of the confession. (*People v Roach*, 215 NY 592; *People v Lipsky*, 57 NY2d 560; *People v Cuozzo*, 292 NY 85; *People v Prado*, 4 NY3d 725; *People v Hines*, 97 NY2d 56; *People v Payne*, 3 NY3d 266; *People v Lane*, 7 NY3d 888; *People v Lytton*, 257 NY 310; *People v Reade*, 13 NY2d 42; *People v Jennings*, 40 AD2d 357.) II. Even after redaction, letters written by appellant to a jailed inmate contained irrelevant and prejudicial material. (*People v Scarola*, 71 NY2d 769; *People v Pobliner*, 32 NY2d 356; *People v Forchalle*, 88 AD2d 645; *People v Conyers*, 52 NY2d 454; *People v Santarelli*, 49 NY2d 241; *People v Ventimiglia*, 52 NY2d 350; *People v Ely*, 68 NY2d 520; *People v Byer*, 89 AD3d 456; *People v Bradley*, 20 NY3d 128.) III. Appellant was denied effective assistance of counsel when counsel, by not objecting or making appropriate motions or argument, failed to protect her rights. (*People v Baldi*, 54 NY2d 137; *Strickland v Washington*, 466 US 668; *People v Pobliner*, 32 NY2d 356; *People v Green*, 183 AD2d 617; *People v Thompson*, 161 AD2d 236; *People v Caruso*, 246 NY 437; *People v Fisher*, 18 NY3d 964; *People v Caban*, 5 NY3d 143; *People v Brown*, 17 NY3d 742; *People v Wlasiuk*, 90 AD3d 1405.)

*Kirsten A. Rappleyea, District Attorney*, Poughkeepsie, for respondent. I. This Court should not consider appellant's argument that the People failed to introduce sufficient evidence to corroborate her confession since she did not properly preserve

this issue in the court below. (*People v Gray*, 86 NY2d 10; *People v Kolupa*, 13 NY3d 786; *People v Lane*, 7 NY3d 888; *People v Hines*, 97 NY2d 56; *People v Monroe*, 49 AD3d 900; *People v Prado*, 4 NY3d 725.) II. Appellant's confession was sufficiently corroborated pursuant to CPL 60.50. (*People v Hamilton*, 121 AD2d 395; *People v Booden*, 69 NY2d 185; *People v Daniels*, 37 NY2d 624; *People v Safian*, 46 NY2d 181; *People v Cuozzo*, 292 NY 85; *People v Reade*, 13 NY2d 42; *People v Lipsky*, 57 NY2d 560; *People v Tinning*, 142 AD2d 402; *People v Hofmann*, 238 AD2d 716.) III. This Court should not consider whether appellant's letters, written to Michael Bryant, were properly received in evidence because appellant failed to preserve the alleged error in the court below. (*People v Santarelli*, 49 NY2d 241; *People v Serrano*, 256 AD2d 175; *People v Harrell*, 194 AD2d 502; *People v Scarola*, 71 NY2d 769; *People v Pearce*, 81 AD3d 856; *People v Thomas*, 17 NY3d 923; *People v Sulayao*, 58 AD3d 769, 12 NY3d 822; *People v Leggett*, 76 AD3d 860.) IV. Appellant received the effective assistance of counsel. (*People v Zaborski*, 59 NY2d 863; *People v Benevento*, 91 NY2d 708; *People v Baldi*, 54 NY2d 137; *People v Henry*, 95 NY2d 563; *Strickland v Washington*, 466 US 668; *People v Fisher*, 18 NY3d 964; *People v Turner*, 5 NY3d 476; *People v Pobliner*, 32 NY2d 356; *People v Wood*, 79 NY2d 958; *People v Tiro*, 100 AD3d 663.)

## OPINION OF THE COURT

PIGOTT, J.

On this appeal, defendant Cheryl Santiago contends that her confession to the police following the death of her stepdaughter was insufficiently corroborated by independent evidence at trial to support her conviction of manslaughter in the second degree. Secondly, she argues that County Court abused its discretion in admitting certain letters into evidence that were not sufficiently redacted. Finally, she argues that she was denied effective assistance of counsel when her trial counsel failed to object to a PowerPoint display during the People's summation. A recitation of the facts underlying defendant's conviction is necessary to address each of these issues.

### I.

When defendant married Santos Santiago in January 2007, her husband had a one-year-old daughter, Justice, from a prior relationship. Santos and the child's mother shared custody, Santos having physical custody on alternate weeks. The arrangement was not to defendant's liking; she was described as somewhat aloof from the child and would complain to Santos that he

spent too much time with his daughter. She concealed the child's very existence from her parents. Santos worked long hours, and, as he later recalled, it particularly aggravated defendant that he would fall asleep during the process of putting his daughter to bed; after he awoke, he would tell defendant that he was too tired to spend time with her and would go back to sleep. In the fall of 2007, Santos, trying to appease defendant, asked her to start putting the child to bed.

On October 23, 2007, defendant and Santos quarreled over what can be described as defendant's perception that the child's presence interfered with their married life. The quarrel was described as intense enough that defendant went into the couple's bedroom and remained there for two hours without speaking to Santos.

When it was time for the child to go to bed that evening, defendant took her into the bedroom where she slept, and lay down next to her. The child was babbling and resisting sleep. Later, defendant emerged from the bedroom and told Santos that the child was "dozing off."

When defendant and Santos retired shortly after 11:00 p.m., Santos could see his daughter's outline in her cot, but he did not approach the cot because he had woken his daughter in the past by doing so. Just after 5:00 a.m. the next morning, Santos awoke. He glanced over at the child as he prepared to leave the apartment, but saw nothing untoward. Santos noticed one unusual thing, however; unlike on other mornings, defendant got up to say goodbye to him and, when he left, double-locked the door behind him.

About 30 seconds after Santos left, he received a call from defendant on his cell phone, telling him Justice was not moving. Santos rushed back to the apartment, where he found his daughter's lifeless body; rigor mortis had set in. A plastic bag lay near the child. Defendant told a grief-stricken Santos that she had removed the plastic bag from Justice's hands. Santos called 911. An EMT arrived and confirmed that Justice was dead.

Defendant and Santos were interviewed separately. At first, defendant told the police that she had discovered the child, lifeless, and had found the plastic bag under her cheek. However, in a later statement to the police, given the evening of October 24, defendant made a confession. She told an investigator that the previous night she had become "frustrated" because she

wanted the child to go to sleep, and placed her hands over the child's mouth and nose for about 30 seconds, "to quiet her." Defendant said that Justice had not struggled and she thought the child had fallen asleep. The next morning, according to defendant's account, she checked on the child, found her cold and stiff, and panicked; she grabbed a plastic bag and placed it under the child's mouth to make it appear that the bag had smothered her during the night. Defendant's statement was reduced to a writing, which she reviewed, edited, and signed. Defendant also made a similar videotaped statement.

That day, an autopsy by Dr. Dennis Chute, Deputy Medical Examiner of Dutchess County, revealed that Justice had been a healthy child and ruled out death as a result of asthma or bronchial issues. Dr. Chute believed that the child had died the previous evening; after reviewing defendant's statements, Dr. Chute completed his report, concluding that Justice had died of asphyxia resulting from suffocation.

## II.

Defendant was arrested and held at Dutchess County Jail. There, male and female prisoners were able to communicate through a fence separating their respective recreation yards, and by writing letters to one another. Defendant befriended an inmate named Michael Bryant, and they began a romantic correspondence. Some of defendant's long letters to Bryant contained passages that were overtly sexual. According to Bryant, defendant, in a subsequent conversation, when asked about her criminal prosecution, admitted that she had killed Justice, saying "I did it, I did it."

Meanwhile, defendant had been charged with murder in the second degree. At a *Huntley* hearing in County Court, defendant's motion to suppress her statements was denied.

At defendant's trial, the People proceeded on the theory that defendant had covered Justice's mouth and nose for several minutes, with the intent to cause her death. Both Santos Santiago and Michael Bryant testified against defendant, the latter telling the jury of defendant's prison yard admission. The jury also viewed the videotaped statement by defendant.

The People introduced defendant's letters to Bryant on the ground that they showed that the relationship between the two inmates was one of mutual trust and confidence. Following objection by defense counsel that the letters were more prejudicial than probative, County Court redacted them, removing

certain passages that the court believed "could be viewed by the jury as unduly prejudicial as to the Defendant's character or lifestyle." Before the redacted letters were read to the jury, defense counsel renewed his objection. However, defense counsel did not single out any specific passages of a sexual nature as being prejudicial, or expressly ask for further passages to be excised after the first round of redactions. County Court denied defense counsel's objection and defendant's redacted letters to Bryant were read to the jury.

The jury also heard medical testimony. Dr. Chute, the coroner, testified that it would have taken four to six minutes for a child of Justice's size and age to suffocate and that "if there was evidence that Justice's mouth and nose were covered by a hand . . . for up to four to six minutes," that would "be consistent with [Dr. Chute's] findings as to cause of death." Several postmortem photographs of the child were admitted into evidence. Dr. Michael Baden, a board-certified pathologist, testified that a child of Justice's age and size would pull away a loose object—such as a plastic bag in front of her face—that was obstructing her breathing.

After the People rested, defense counsel moved for dismissal on the ground, among others, that the People had failed to provide corroboration of the statements made by defendant to the police. County Court denied the motion.

Defendant then testified in her own defense. She insisted that her first statement to the police was true and that the subsequent statement in which she confessed to putting her hand over Justice's mouth and nose was false. She also denied confessing her guilt to Bryant.

A board-certified pathologist, Dr. Jeffrey Hubbard, testified for the defense, stating that he could not determine the cause of Justice's death with any reasonable degree of medical certainty.

When the defense rested, defense counsel did not renew his motion to dismiss on the ground of insufficient corroboration of defendant's confession. Nor did defense counsel make a general motion to dismiss.

## III.

During the People's summation, the prosecutor—alluding to Dr. Chute's discussion of the length of time it would have taken for a child of Justice's age and size to suffocate—said to the jury: "[I]f there's any question in your mind how long six

minutes takes, take a look at this." The jury was then shown, for a duration of six minutes, a PowerPoint presentation that consisted of a series of slides using a postmortem photograph of Justice. The slides changed at regular intervals, with each successive slide progressively fading, until the final slide was entirely white, thus eliminating the image of Justice. Some of the slides were accompanied by captions: "one and a half to two minutes, struggle ends," "four minutes, brain death occurs," and "four and a half to six minutes, cardiac death." Defense counsel did not object to the slides.

In its jury charge, County Court gave the jurors the following limiting instruction concerning defendant's letters to Bryant:

> "The People want to offer these letters as evidence that the Defendant knew Michael Bryant and that her relationship with him was such that she would confide in him. That is the purpose for which I . . . allowed the letters into evidence. . . . The letters are not to be viewed by you with regards to the Defendant's character or her [lifestyle]. The letters are to be viewed by you only for the purpose I've explained."

County Court instructed the jury with respect to murder in the second degree, manslaughter in the second degree, and criminally negligent homicide. The jury found defendant guilty of murder in the second degree, and she was sentenced accordingly.

## IV.

The Appellate Division found that the jury verdict of second-degree murder was against the weight of the evidence, reasoning that although

> "the evidence, properly weighed, proves beyond a reasonable doubt that the defendant placed her hand over the victim's mouth and nose, and that this act caused the infant's death, it does not prove beyond a reasonable doubt that it was her conscious objective to kill the infant victim . . . The evidence supports a finding that the defendant acted recklessly in covering the infant victim's nose and mouth in a misguided effort to quiet the victim in order for her to sleep, but not as a part of a calculated effort to kill the infant victim" (97 AD3d 704, 706 [2d Dept 2012]).

However, the Appellate Division rejected defendant's other challenges to her conviction, which included the contention that she had been denied the effective assistance of counsel. Consequently, the Appellate Division modified County Court's judgment by reducing defendant's murder conviction to a conviction of second-degree manslaughter and vacating the sentence, and affirmed the judgment as modified, remitting only for resentencing (*id.* at 706-707).

A Judge of this Court granted defendant leave to appeal (20 NY3d 935 [2012]). We now affirm.

## V.

Defendant initially argues that her confession to the police was not sufficiently corroborated by independent evidence at trial. In essence, defendant asserts that there is insufficient evidence that Justice's death involved any criminal act.

Criminal Procedure Law § 60.50 provides: "A person may not be convicted of any offense solely upon evidence of a confession or admission made by him [or her] without additional proof that the offense charged has been committed." We have reiterated that the required supplementary evidence, corroborating a confession, may be

> "sufficient even though it fails to exclude every reasonable hypothesis save that of guilt. Indeed, the statute is satisfied by the production of some proof, of whatever weight, that *a crime was committed by someone* . . . . In final analysis, of course, the additional evidence of the crime together with the confession must be sufficient to establish defendant's guilt beyond a reasonable doubt" (*People v Lipsky*, 57 NY2d 560, 571 [1982] [internal quotation marks and citations omitted; emphasis added]).

The rule, long-established, is that the additional evidence must be evidence that the charged crime was committed, and need not be evidence that the crime was committed by defendant (*see id.*; *see also People v Cuozzo*, 292 NY 85, 91-92 [1944]; *People v Roach*, 215 NY 592, 601 [1915]).

The People respond that defendant failed to preserve the corroboration argument. At the end of the People's case, defense counsel moved to dismiss on the ground that defendant's confession was not corroborated under CPL 60.50, but he did not renew the motion when the defense rested. The People cite our precedent that if a trial judge denies defendant's motion to

dismiss at the close of the People's case, and the defendant does not renew his motion to dismiss after defendant has presented his case, defendant will be considered to have "waived review of the mid-trial decision" to deny the motion to dismiss (*People v Hines*, 97 NY2d 56, 61 [2001]; *see also People v Kolupa*, 13 NY3d 786, 787 [2009]; *People v Lane*, 7 NY3d 888, 889 [2006]; *People v Payne*, 3 NY3d 266, 273 [2004]).*

For her part, defendant asks us to overrule *Hines*. In the alternative, defendant argues that defense counsel's failure to renew his motion to dismiss based on insufficient corroboration of the confession amounts to ineffective assistance of counsel, either alone or in combination with other errors.

■ Contrary to defendant's arguments, it is clear that a motion to dismiss on the ground of lack of corroboration would have been properly denied. There was independent evidence that a crime occurred, corroborating defendant's confession. The jury heard testimony showing that Justice's death by suffocation involved a human agent other than herself. In particular, Dr. Baden testified that Justice, a healthy child, would not have allowed herself to suffocate from a loose object such as a plastic bag obstructing her breathing, but, given her age and size, would have pushed it aside.

It follows that defendant's failure to renew his motion to dismiss did not amount to ineffective assistance of counsel. We need not address defendant's corroboration challenge further, or decide whether the *Hines* rule applies here.

## VI.

Defendant's second challenge relates to the letters she wrote to Bryant in prison. She argues that County Court abused its discretion when it admitted in evidence overtly sexual portions of the letters.

■ Defense counsel attempted to persuade County Court that the letters in general were prejudicial and not probative, and he renewed this objection, with no success, before the letters were

---

* We have carved out an exception to the *Hines* rule, applicable when the defendant makes a general motion to dismiss after the close of his proof. If, in such a case, the trial court makes "specific findings as to corroboration," then we consider the question of corroboration to have been "expressly decided" by the trial court within the meaning of CPL 470.05 (2), even if defendant did not expressly move to dismiss on that ground (*People v Prado*, 4 NY3d 725, 726 [2004]). But *Prado* does not apply in this case, because defense counsel did not make a general motion to dismiss.

read to the jury. However, defense counsel did not single out the specific passages of a sexual nature that defendant now argues were wrongly admitted. Having achieved certain redactions, he did not ask for redaction of the sexual passages that defendant now argues were wrongly admitted. Hence defendant's second challenge was not preserved for our review.

■ Again, defendant raises the alternative argument that the failure to preserve this issue constituted ineffective assistance of counsel. Under the circumstances, keeping in mind that defendant succeeded in achieving certain redactions as well as a proper limiting instruction that the jury must be presumed to have obeyed (*see e.g. People v Morris*, 21 NY3d 588, 598 [2013]; *People v Davis*, 58 NY2d 1102, 1104 [1983]), we cannot conclude defense counsel provided less than meaningful representation with respect to the issue of the letters (*see generally People v Baldi*, 54 NY2d 137, 147 [1981]). Moreover, given the limiting instruction, the result of defendant's appeal would not have been different had defense counsel preserved the issue by asking for further redactions (*see generally Strickland v Washington*, 466 US 668, 694 [1984]).

## VII.

The final issue is whether defense counsel was ineffective for not objecting to the People's summation. Defendant contends that the prosecutor's use of slides had no purpose other than to engender a feeling of horror and were no part of any legitimate argument. She argues that defense counsel's failure to object was, on its own, so egregious and prejudicial a failing as to deprive her of effective assistance of counsel.

In summation, "counsel is to be afforded 'the widest latitude by way of comment, denunciation or appeal in advocating his cause'" (*People v Ashwal*, 39 NY2d 105, 109 [1976], quoting *Williams v Brooklyn El. R.R. Co.*, 126 NY 96, 103 [1891]), though within limits that are principally those of relevance (*see Ashwal*, 39 NY2d at 109-110). Had defense counsel objected, the trial court would have had the opportunity to decide whether the challenged aspect of the PowerPoint presentation constituted "a fair comment on the evidence" or was instead "totally irrelevant to any legitimate issue presented at the trial" (*Ashwal*, 39 NY2d at 110; *see e.g. People v Green*, 183 AD2d 617, 618 [1st Dept 1992]).

Whether the trial court would have been required by the law to sustain an objection to the entirety of the PowerPoint presentation is not clear from this record. The People contend that

the presentation of the photograph, for a duration of six minutes, during which time captions illustrating points of medical testimony were also displayed, was relevant to the testimony heard by the jury that it would have taken up to six minutes for Justice to die of suffocation. Defendant does not dispute that the postmortem photograph itself was properly admitted at trial (*see People v Pobliner*, 32 NY2d 356, 369 [1973]). The slides depicting an already admitted photograph, with captions accurately tracking prior medical testimony, might reasonably be regarded as relevant and fair, albeit dramatic, commentary on the medical evidence, and not simply an appeal to the jury's emotions. The jury was being asked to decide not only whether defendant killed Justice, but also whether she intended to do so, an issue to which the question of how long she would have had to cover Justice's mouth and nose was certainly relevant. On the other hand, the relevance of the visual device whereby the postmortem picture faded at 30-second intervals over a six-minute period—with each slide fading more and more to white, and the final slide appearing totally white—is difficult to discern. This did not show how Justice's death occurred nor would it have aided the jury in its fact-finding function.

■ If the issue had been preserved for our review by timely objection—and had the trial court ruled against defendant and the issue reached our Court—this Court would have had the opportunity to decide whether the trial court abused its discretion and the error required a reversal of the judgment of conviction. But that did not occur and the objection to the PowerPoint presentation that defendant now raises is not so "clear-cut" or "dispositive" an argument that its omission amounted to ineffective assistance of counsel (*see People v Howard*, 22 NY3d 388, 400 [2013]; *People v Turner*, 5 NY3d 476, 481 [2005]).

Accordingly, the order of the Appellate Division should be affirmed.

RIVERA, J. (dissenting). Defense counsel's failure to object to the prosecutor's use during summation of a PowerPoint presentation that manipulated the evidence, and was designed to inflame the passion of the jury in order to engender prejudice against the defendant, constitutes an error of the type that so tainted the jury's deliberative process as to deny defendant a fair trial. Given the egregious nature of defense counsel's error, I disagree with the majority's conclusion that defendant received meaningful representation. Therefore, I dissent.

We have admonished that the prosecutor's summation "should not seek to lead the jury away from the issues by drawing irrelevant and inflammatory conclusions which have a decided tendency to prejudice the jury against the defendant" (*People v Ashwal*, 39 NY2d 105, 110 [1976], citing *People v Posner*, 273 NY 184, 190 [1937]; *see also People v Levan*, 295 NY 26, 36 [1945]; *People v Carborano*, 301 NY 39, 42 [1950]; *Berger v United States*, 295 US 78 [1935]). Where a prosecutor's summation "venture[s] well beyond the evidence and the bounds of fair comment," a defendant is deprived of a fair trial (*People v Riback*, 13 NY3d 416, 421, 423 [2009]). Hence, "defense counsel's failure to object to . . . [a] prosecutor's egregiously improper departures during summation . . . deprive[s] [a] defendant of the right to effective assistance of counsel" (*People v Fisher*, 18 NY3d 964, 967 [2012], citing *People v Baldi*, 54 NY2d 137, 146-147 [1981]).

Summation "must stay within 'the four corners of the evidence' . . . and avoid irrelevant comments which have no bearing on any legitimate issue in the case" (*Ashwal*, 39 NY2d at 109, quoting *Williams v Brooklyn El. R.R. Co.*, 126 NY 96, 103 [1891]). The purpose of summation is for counsel to argue to the factfinder, in the prosecutor's case, a view of the evidence and the inferences to be drawn therefrom favorable to the People (*see People v Smith*, 16 NY3d 786, 787-788 [2011], citing *Ashwal*, 39 NY2d at 110, and *Williams*, 126 NY at 103), within proper bounds of discourse (3 Robert G. Bogle, Criminal Procedure in New York § 46:9 at 25 [2d ed 2008]; *People v LaValle*, 3 NY3d 88, 115-116 [2004], quoting *People v Harris*, 98 NY2d 452, 492 n 18 [2002]). Although this exercise in adversarial oratory need not be dispassionate in delivery, and counsel may choose to employ various linguistic and rhetorical devices, the prosecutor cannot redirect the factfinder's deliberative process from the evidence by playing on emotion (*see Fisher*, 18 NY3d at 966, citing *Ashwal*, 39 NY2d at 109-110).

In determining whether the prosecutor has crossed the line of legitimate summation argument, we are guided by the evidence presented to the jury and the nature of commentary made during summation. Here, the prosecution argued in summation that defendant had a motive to kill and that she prevented the child from breathing for four-to-six minutes, the time the prosecution's expert witnesses testified it would take for the child to die of asphyxiation. At the end of summation, the prosecutor presented the six-minute PowerPoint, which consisted of one photo of the dead child, converted to a series of

slides altered by imposing a caption on each slide, referencing the passage of time in 30-second intervals. Each slide projected the image of the child fading slightly more with each 30-second interval, until eventually the child's image disappeared and only a white screen remained.

The People argue that this attempt at a "real time" simulation of the child's death by asphyxiation offered fair commentary on the evidence by illustrating the time it took for the child to die. This argument severely downplays the inflammatory nature of the PowerPoint, and is simply not borne out by the PowerPoint's contents or the evidence presented to the jury. Any doubts as to the emotional responses engendered by the presentation are easily dispelled by viewing the slide show, wherein the picture of a 21-month-old child, in her pink pajamas, with white froth on her lips, her body prone and lifeless, is projected over and over, fading slightly with each slide, until all that remains is a white background and the memory of her tiny body. One simply cannot be but moved by this depiction.

At best, the PowerPoint was an inaccurate presentation of the moments leading up to the child's death because the slide is a picture of her corpse, and as such is of no assistance to the jury's understanding of the issues relevant to the jury's fact-finding process related to causation or intent. If this were all one could say about the PowerPoint it might survive scrutiny. However, this is not all that can be said. For although the photograph of the child's body was in evidence, and could have been referenced during summation, the slide show manipulated that actual photograph, depicting it seriatim until it faded to a white screen. It is questionable whether the faded versions of the photograph can even be considered to have been properly in evidence.* The prosecutor's use of this PowerPoint imagery was an impermissible attempt to secure a verdict based on emotion and repulsion for the defendant, rather than facts.

---

* It is true that a postmortem photograph of a victim is admissible "to prove or disprove some material fact in issue" (*People v Pobliner*, 32 NY2d 356, 369 [1973]), but "[p]hotographic evidence should be excluded . . . if its sole purpose is to arouse the emotions of the jury and to prejudice the defendant" (*id.* at 370, citing M. C. Dransfield, Annotation, *Admissibility of Photograph of Corpse in Prosecution for Homicide or Civil Action for Causing Death*, 73 ALR2d 769; *People v Rial*, 25 AD2d 28, 30 [4th Dept 1966]; *People v Lewis*, 7 AD2d 732, 732 [2d Dept 1958]). It is no less important during summation to avoid the use of enhanced photographic imagery and its prejudice to the defendant.

The People rely on *People v Caldavado* (78 AD3d 962 [2010]) and other cases permitting the use of a PowerPoint presentation in prosecutions involving shaken baby syndrome. However, these cases are distinguishable in that they sanctioned the use of a slide show to aid the jury in understanding the force necessary to cause death, as well as the mechanics and injuries associated with shaken baby syndrome (*see Caldavado*, 78 AD3d at 963; *People v Sulayao*, 58 AD3d 769, 770 [2009]; *People v Mora*, 57 AD3d 571, 572 [2008]). Here, the PowerPoint did not address a difficult technical or medical issue. A single photo of a dead child's body, progressively fading into oblivion, depicted nothing unique about the time it took for the child to die of asphyxiation. It simply cannot be argued that jurors were unable to appreciate the difference between a few minutes—the time the prosecutor argued defendant took to kill the child— and 30 seconds—the time defendant alleged she covered the child's mouth. Neither can the captions that accompanied several of the slides be considered fair commentary on the evidence. Indeed, they provided no commentary whatsoever, but merely reiterated the forensic testimony of the People's experts regarding the points at which the child would have experienced successive phases of physical deterioration. As such, the captions served only to further dramatize the already flagrantly inappropriate emotional display.

With the ever increasing use of technology and ease with which evidence may be presented, even with minimal computer resources, we must be mindful of the impact of technology on events in the courtroom, and, most especially, on the criminal justice system. It is easy to view the use of certain technological devices in the courtroom as merely another way of presenting evidence. We cannot forget, however, that technology also serves as a powerful tool to communicate images and concepts in ways that engage the jury distinctly, and perhaps more effectively, than the spoken word. This is no less true during summation, when "any argument that drones on for 5 or 10 minutes on any one point, regardless of how effective its content is, will lose the jury" (Thomas A. Mauet, Trial Techniques 394 [8th ed 2010]). Visual aids are a welcome relief since "[b]y the end of the trial, jurors are looking for new and fresh ways of receiving evidence and arguments" (*id.*). The use of technology at the end of closing argument may be particularly powerful. As one commentator has noted, "[t]he right to the final word has a psychological impact that makes it a forensic prize" (Siegel, NY Prac § 397 at 692 [5th ed 2011]).

Counsel's failure to object cannot be explained as merely tactical (*Baldi*, 54 NY2d at 146; *see also People v Rivera*, 71 NY2d 705, 708 [1988]; *People v Satterfield*, 66 NY2d 796, 799-800 [1985]). One is hard-pressed to imagine any benefit defendant could reasonably derive from allowing the People to proceed with the presentation. If an objection had been raised and sustained, defense counsel would have prevented the jury from viewing an undeniably powerful depiction of a dead child clothed in her pajamas, on the floor next to her bed, vulnerable, and helpless to save herself. The notion that defense counsel's silence was designed to expose the weakness of the People's evidence is utterly untenable; if anything, given the emotional nature of the case, it was all the more incumbent upon counsel to object to such a prejudicial appeal to the jury's sympathies. Indeed, defense counsel was well aware of the impact that juror emotion could have on the outcome of the case when he stated in summation that it was "not easy" to find his client innocent in light of the fact that "there's a child who's dead" (appendix for defendant-appellant at A436).

Furthermore, while any defense counsel may be concerned about interrupting the prosecutor's summation and as a consequence "look[ing] bad to the jury, or draw[ing] rebuke from the judge" (*Fisher*, 18 NY3d at 970 [Smith, J., dissenting]), the fact is that attorneys do object—defense counsel and prosecutors alike (*see e.g. id.* at 969 [noting that the prosecutor objected three times during the defendant's summation]), and generally they must do so to preserve arguments regarding summation (*compare Ashwal*, 39 NY2d at 108-109 *with LaValle*, 3 NY3d at 116; *see also* majority op at 751). Here, there was no discernible strategic advantage in staying quiet when defense counsel was faced with the powerful imagery presented by the prosecutor.

The majority concedes that the PowerPoint failed to "aid[ ] the jury in its fact-finding function," but, nevertheless, concludes that the objection to the PowerPoint was "not so 'clear-cut' or 'dispositive' " (majority op at 751). I cannot agree that if, as the majority states, the summation fell below our standard for acceptable summation commentary, defense counsel's objection would have been an exercise in futility. It is simply not a fair trial if the prosecution puts before the jury in summation a "horrid and gruesome" portrayal of the body of the child, where the PowerPoint "could only have served, under the circumstances of this case, to have aroused the passions and the resentment of the jury against defendant and to have kept

it from fairly and objectively considering the issues before it" (*People v Wood*, 79 NY2d 958, 961 [1992, Titone, J., dissenting]).

Given the strong potential for the summation PowerPoint to engender an emotional response from the jury, and thereby detract from its duty to render a verdict based on the facts and evidence presented (*see Ashwal*, 39 NY2d at 109), defense counsel's failure to object, constitutes ineffective assistance of counsel and denied defendant meaningful representation (*Baldi*, 54 NY2d at 146-147; *see also People v Benevento*, 91 NY2d 708, 712 [1998]; *People v Hobot*, 84 NY2d 1021, 1022 [1995]).

Judges GRAFFEO, READ, SMITH and ABDUS-SALAAM concur with Judge PIGOTT; Judge RIVERA dissents and votes to reverse in an opinion in which Chief Judge LIPPMAN concurs.

Order affirmed.