[837 NYS2d 101]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LEROY DICKERSON, Appellant.

First Department, June 5, 2007

**APPEARANCES OF COUNSEL**

*Mischel & Horn, P.C.*, New York City (*Lisa R. Marlow Wolland* and *Richard E. Mischel* of counsel), for appellant.

*Robert M. Morgenthau, District Attorney*, New York City (*Hilary Hassler* and *Eleanor J. Ostrow* of counsel), for respondent.

**OPINION OF THE COURT**

CATTERSON, J.

On August 31, 1996, police officers responding to a call at the home of the defendant and his wife Carla Lockwood found the emaciated remains of Nadine Lockwood, their daughter, in a filthy crib. She weighed 15 pounds, and looked like little more than a skeleton. The officers were shocked to discover that Na-

dine would have been five years old had she lived another 19 days.

Subsequently, medical evidence would reveal that Nadine had been starved since infancy and towards the end she "began to break down her own internal organs to sustain her life." Police arrested Lockwood the next morning; and, following an investigation, the defendant was also arrested and charged with two counts of second-degree murder (depraved indifference murder and depraved indifference murder of a person less than 11 years old). After a jury trial, the defendant was convicted of both counts and sentenced to concurrent indeterminate terms of imprisonment of 25 years to life.

On appeal, the defendant argues that the convictions should be reduced to criminally negligent homicide since depraved indifference was not proved beyond a reasonable doubt. The defendant argues that Nadine lived with her mother, and he only made sporadic visits, during which he fed Nadine and did not perceive that she was starving to death. He also argues that he was deprived of a fair trial by the admission of gruesome and unnecessary autopsy photos and that his sentence is excessive.[1]

For the reasons set forth below, this Court disagrees and unanimously affirms the defendant's convictions for depraved indifference murder. The defendant was not deprived of a fair trial; his sentence is deserved, not excessive, since, as the trial court rightly observed, any possible mitigating factors pale in comparison to the unspeakable horror of Nadine's death.

"Murder, the unique crime, is a paradigm of its age."[2] Testimony and evidence at trial established that five-year-old Nadine was starved to death. The testimony of Nadine's pediatrician established that at birth Nadine was a healthy baby, weighing more than six pounds and measuring 19 inches. Her head circumference and alertness scores were within normal range. In her first year, however, Nadine's growth rate dropped and her records noted "failure to thrive." The pediatrician did not see Nadine after she was 10 months old.

At her death, just before her fifth birthday, Nadine weighed 15 pounds, a weight more appropriate for a six-month-old child, and she was 32 inches long, the average measurement for an 18 month old. Her brain size of 830 grams was also more appropri-

---

1. Carla Lockwood pleaded guilty to second-degree murder and was sentenced on October 24, 1997 to 15 years to life. She has not appealed.
2. P.D.James, The Murder Room (Vintage, reprint ed 2004).

ate for an 18-month-old child. The medical examiner testified that Nadine was emaciated, had no muscle mass, as well as having sunken eyes and cheeks. She had hair loss, and prominent bones protruded through her skin. Her anus protruded due to a lack of soft tissue in her buttocks. Her internal organs were abnormally small. Nadine also had small scars and fresh bruises scattered on her body. There was no elasticity to her skin. There was vomit in her airways and evidence of prolonged aspiration.

Both Nadine's pediatrician and the medical examiner testified that Nadine's small brain size was attributable to being starved from sometime between 3 and 10 months prior to her death. They concluded that she had experienced "terminal starvation," meaning that her body was breaking down vital organs to survive. Her bones had simply stopped growing due to inadequate calorie intake. Both the pediatrician and the medical examiner agreed that Nadine had died as a result of malnutrition and dehydration that was a direct result of starvation which had been going on for at least one year.

At trial, testimony and evidence further established the following: Nadine was the fourth child born to the defendant and Lockwood, who were married in 1986. Through a previous relationship, Lockwood had a daughter, Nicole, who lived with the family. Several months before Nadine was born, the defendant left Lockwood. The following year, Lockwood and the five children moved into a three-bedroom railroad flat. Subsequently, the defendant "reconciled" with Carla and they had two more children in 1993 and 1994. Although reconciled, the defendant lived with his mother but he would visit Lockwood every two weeks, coinciding with her receipt of her public assistance checks, and stay "a day, a night, a few days." Everyone slept on mattresses in the rear bedroom, except Nadine, who slept in a crib.

The testimony of the three older children as well as friends and neighbors who visited established that the defendant and Lockwood treated Nadine differently from the other children and were distant and cold to her from the beginning. While everyone else ate in the living room, Nadine was not allowed out of her crib to join the family for dinner. She ate in her crib or watched the other children eat. The defendant and Lockwood restricted Nadine's food, often feeding her scraps and leftovers. Some days Nadine got nothing at all to eat and cried from hunger.

Nadine, who at first talked and knew her siblings' names, spent most, and eventually all, of her time in her dirty crib.

There was no sheet on the mattress but a sheet hung over the rail to block the view inside. Nicole and two of the other children testified that both parents (the defendant and Lockwood) beat Nadine; and that she was made to stand up in a corner of the crib facing the wall with her hands behind her back. Nicole also testified that the defendant yelled at Nadine and called her an "animal" and "beast."

As Nadine continued to receive little food, she stopped talking and playing. A neighbor testified that "she was frail and pale and could barely walk like a two year old should." By early 1994, when Nadine was almost three, the defendant, Lockwood and the children were lying to neighbors and friends, telling them that Nadine was living "down south" with the defendant's sister. When visitors came to the apartment, the defendant or Lockwood hid Nadine.

Testimony further established that during this period, the defendant was at the house frequently. On one occasion, while playing "flight school" with the children, the defendant threw Nadine against the ceiling, cutting her back. Another time, when Nadine was crying, the defendant said he would give her "something to cry for." He placed her in a plastic bag and swung her around the room. The bag broke and Nadine struck a dresser, causing a bloody gash above her eyebrow. The defendant did not seek any medical attention for her.

In June 1995, someone called the child abuse hotline anonymously and reported that Nadine, who at age three looked like a "third world child," was being isolated and starved. On July 8, 1995, a sergeant from the NYPD's child abuse unit went to investigate. Lockwood "borrowed" a neighbor's child who pretended to be Nadine. The police sergeant concluded that the allegations were unfounded.

According to the testimony of the two eldest children, between April and May 1996, the defendant lived continuously in the apartment. By this time, Nadine, who spent her days lying in the crib crying, had visible bones and hair loss.

At the end of May 1996, the defendant moved out after another argument with Lockwood. In June 1996, he returned. A neighbor testified that between July 4 and August 31, 1996, she observed the defendant making nighttime visits and on one occasion he answered the door when she went to borrow some milk. Other neighbors and relatives also testified to seeing the defendant in the apartment throughout August 1996. The defendant himself testified that, although he was not living in the

apartment, he visited every two or three weeks between August 1995 and 1996. Finally, the testimony of Nathan, one of the older children, established that, on August 31, 1996, Lockwood sent him to the store to buy Ensure for Nadine, but that Nadine just spit up the drink and then "stopped breathing, closed her eyes, and died."

A defense expert, Dr. Daniel Perl, opined at trial that Nadine may have suffered from Rett Syndrome, a neurodevelopmental disorder that might have interfered with her ability to eat and swallow. However, he conceded that, regardless of Rett Syndrome, anyone who saw Nadine would have known she needed help. He agreed with the People's medical witnesses that Nadine would likely not have died had she received proper medical treatment and assisted feeding.

The court charged the two counts of depraved indifference murder and instructed the jury to consider the lesser included offenses of second-degree manslaughter and criminally negligent homicide only if it found the defendant not guilty of both murder counts. After deliberating for 1¼ hours, the jury returned a guilty verdict on the murder counts.

While conceding that he had a nondelegable duty of care as to Nadine's health and well-being (see People v Steinberg, 79 NY2d 673, 680 [1992]), the defendant argues that the evidence showed only that he failed to perceive the risk of death to Nadine during his sporadic visits to Lockwood's home. He contends that he asked Lockwood to get medical help, but she resisted or lied to him; and Lockwood controlled the home and he could not fight with her. Relying on People v Payne (3 NY3d 266 [2004]), he asserts that the evidence was legally insufficient to establish that he acted with "conduct evincing a depraved indifference to human life"; and that his case is distinguishable from cases of depraved indifference murder based on malnutrition of a child (see e.g. People v Word, 260 AD2d 196 [1st Dept 1999], lv denied 93 NY2d 1029 [1999], 94 NY2d 799 [1999]) because he did not actively participate in Nadine's daily life.

As to the weight of the evidence, defendant asserts that the jury convicted him because it was shocked at Nadine's condition at the time of her death, and that the children who testified against him were biased and, in any event, their memory of his actions and conduct is questionable because of their age at the time of the events at issue.

The defendant's arguments are entirely without merit. In People v Suarez (6 NY3d 202 [2005]), the majority held that the

statutory language that the defendant act "[u]nder circumstances evincing a depraved indifference to human life" constitutes an additional element of second-degree murder which comprises both depravity and indifference, and has meaning independent of recklessness and the gravity of the risk created. (*Id.* at 214.) In *People v Feingold* (7 NY3d 288 [2006]), the majority made clear that it had overturned *People v Register* (60 NY2d 270 [1983]), and that depraved indifference is a culpable mental state and not an objective assessment of the surrounding circumstances. Accordingly, under recent majority holdings of the Court of Appeals, evidence resulting in a conviction of depraved indifference murder may be found legally insufficient where: (1) it demonstrates a "manifest intent to kill," thereby negating the core element of recklessness; or (2) it fails to establish the required culpable mental state of depravity and indifference. (*See Suarez, supra* at 208, 214.)

Here, the slow starvation of Nadine over a period of five years does not reflect a "manifest intent to kill," such as exists in a one-on-one shooting or stabbing. (*See, Payne, supra*; *Suarez, supra*; *see also People v Gonzalez*, 1 NY3d 464 [2004]; *People v Hafeez*, 100 NY2d 253 [2003].) Further, in describing the requisite culpable mental state, the Court of Appeals in *Suarez* (6 NY3d at 214) stated:

> "depraved indifference is best understood as an utter disregard for the value of human life—a willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not. Reflecting wickedness, evil or inhumanity, as manifested by brutal, heinous and despicable acts, depraved indifference is embodied in conduct that is so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy as to render the actor as culpable as one whose conscious objective is to kill." (Internal quotation marks and citation omitted.)

Under this standard, in one-on-one killings, categories where depraved indifference may be found include: (1) where a defendant intends neither to seriously injure, nor to kill, but nevertheless abandons a helpless and vulnerable victim in circumstances where the victim is highly likely to die or (2) where a defendant—acting with a conscious objective not to kill but to harm—engages in torture or a brutal, prolonged and ultimately fatal course of conduct against a particularly vulnerable victim.

Here, without question, the defendant's conduct rises to the level of depravity "manifested by brutal, heinous and despicable acts" necessary to establish culpability for second-degree murder for unintended death in the second category. First, Nadine was a baby, unable to walk, talk or fend for herself when the defendant and Lockwood began starving her in her first year of life, and so, without doubt, she was a particularly vulnerable victim. Second, by any possible definition of "prolonged" there was, in this case, a prolonged course of heinous conduct, including mental and physical abuse, tantamount to torture, in which she was virtually a prisoner in her filthy crib, hidden away from anyone who might intervene on her behalf. The starvation continued until her death at five, by which time she had no muscle mass or fat to speak of and was virtually a skeleton, with severely retarded growth, organs that were being metabolized in her body's efforts to nourish itself, and a brain too small to function properly. This and other credible evidence refutes any possibility that defendant was unaware of Nadine's dire condition. (*See People v Best*, 85 NY2d 826 [1995].)

Moreover, the defendant's reliance on *People v Swinton* (7 NY3d 776 [2006]) is misplaced. In *Swinton*, the Court of Appeals found that the evidence was legally insufficient to prove beyond a reasonable doubt that the defendants acted with the culpable mental state of depraved indifference where their 16-month-old child, weighing 10 pounds, suffered severe malnutrition due to a nutritionally deficient diet imposed by the parents. However, in contrast to this case, there was substantial evidence presented at trial, by both the prosecution and the defense, that the defendants were loving, caring parents who attempted to meet their child's nutritional needs, albeit misguidedly.

In contrast, the defendant in the instant case participated in the prolonged starvation and abuse directed at Nadine. Mitigating evidence simply does not exist. Additionally, the jury was entitled to credit the People's expert testimony, that whether Nadine had Rett Syndrome is irrelevant because all of the medical evidence established that she died of dehydration and starvation. Even with the syndrome, she would have lived had she received proper treatment.

The credibility of the children and other witnesses was before the jury, and their testimony was by and large consistent with that of the neighbors and relatives who testified. While the defendant contends that he occasionally fed Nadine, that is of

little help to him, given the proof demonstrating that Nadine was slowly starved almost since birth. Additionally, while the defendant claims he was not in the apartment in May and June of 1996, the jury was entitled to credit the neighbors' testimony to the contrary. In any event, the defendant conceded that Nadine, at the time of her death, was in the same condition as when he last saw her, and the medical evidence demonstrates that the starvation was over a prolonged period of time. In other words, the defendant did nothing to prevent, but in fact contributed to, his daughter's painful death from wasting away over a period of almost five years.

■ The defendant's assertion that the autopsy photos were inflammatory and not admissible is also without merit. Several photos depicted the absence of fat and muscle tissue in virtually every part of Nadine's body and the related protrusion of bones. Others showed body ulcerations. The People contended that these photos differed from the crime scene photos in that Nadine's body had been washed, revealing more clearly conditions such as the loss of skin pigmentation, a significant indicator of malnutrition and starvation. The trial court ruled that the photos were relevant to establish not only the cause of death but the time period over which malnutrition occurred.

On appeal, the defendant argues that the court erred when it admitted the autopsy photos because there was no question that Nadine died as a result of malnutrition and dehydration. The defendant maintains that the graphic photos of Nadine's malnourished body were irrelevant and inflammatory, and their prejudice outweighed their probative value. Even if the autopsy photos were relevant, the defendant maintains that there was no justification for allowing the photo of Nadine's genitalia because there were no allegations of sexual abuse, and the other photos showed the lack of fat on her body, so that the jury did not need to see her protruding rectal area and labia. The defendant asserts that the admission of the photos was not harmless error because the proof of his guilt was not overwhelming and that the fact that not all photos were admitted or that the jury was limited in viewing them did not render the court's ruling as to the admission of the remainder a proper exercise of discretion.

The defendant's arguments are not persuasive. At trial, defense counsel did not single out the photo of Nadine's genitalia or make the specific argument he now raises with respect to that photo. Accordingly, that aspect of his argument is

unpreserved. (*See* CPL 470.05 [2]; *People v Williams*, 28 AD3d 1059 [4th Dept 2006], *affd* 8 NY3d 854 [2007]; *People v Cruz*, 249 AD2d 136 [1st Dept 1998], *lv denied* 92 NY2d 924 [1998].) In any event, "[p]hotographic evidence should be excluded only if its sole purpose is to arouse the emotions of the jury and to prejudice the defendant." (*See People v Pobliner*, 32 NY2d 356, 370 [1973], *cert denied* 416 US 905 [1974].) Where the photo tends to prove or disprove a disputed or material issue, to illustrate or elucidate other relevant evidence, or to corroborate or disprove some other evidence offered or to be offered, whether to permit the jury to view it falls within the sound discretion of the trial court. (*See People v Stevens*, 76 NY2d 833, 835 [1990].) The fact that a photograph may be gruesome does not preclude its admission where it is not offered for the sole purpose of arousing the emotions of the jury or to prejudice defendant. (*See People v Wood*, 79 NY2d 958, 960 [1992].)

In the instant case, the defendant claimed that he thought that Nadine was thin and wiry, but in no danger of starvation. Thus, the autopsy photos were relevant to the disputed issue of Nadine's condition both at her death and prior thereto, as well as clearly probative of defendant's awareness of the grave risk her condition presented. The photos served to corroborate and illuminate the testimony of the medical examiner. The photo of Nadine's vagina and rectal area highlighted the absolute wasting of fatty tissue and muscles and illustrated the medical examiner's finding of the ravaging toll that terminal starvation had taken on her body.

■ Lastly, the defendant argues that the trial court did not consider his background or the circumstances surrounding the crime before "throwing the book" at him. He asserts that he was punished for being a semi-absent father and for rejecting a plea offer of 8⅓ to 25 years. Defendant posits that had the court properly considered that he was a first time offender, who had served in the military and was liked in the neighborhood, that he did not perceive the harm being caused to Nadine, that Rett Syndrome contributed to Nadine's condition, and that he accepted a degree of responsibility for his actions, it would not have sentenced him to 25 years to life, when Lockwood, the primary offender, received only 15 years to life.

So far as comparing the sentences, this Court notes only that Lockwood's sentence may be viewed as too short, and accordingly not an appropriate reference for gauging the propriety of the defendant's sentence. As the trial court observed, Nadine's

death was "so horrific" that "the case is in a realm almost of its own." The defendant showed a complete lack of remorse, casting all the blame on Lockwood. The trial court noted the defendant's employment and military background but found that the mitigating factors paled in comparison to the unspeakable horror of Nadine's death. This Court agrees, and so finds no reason to intervene.

Accordingly, the judgment of the Supreme Court, New York County (Michael J. Obus, J.), rendered August 8, 2002, convicting defendant, after a jury trial, of two counts of murder in the second degree (depraved indifference and depraved indifference murder of a person less than 11 years old) and sentencing him to concurrent indeterminate terms of imprisonment of 25 years to life, should be affirmed.

Tom, J.P., Williams and Gonzalez, JJ., concur.

Judgment, Supreme Court, New York County, rendered August 8, 2002, affirmed.