People v Horn (2020 NY Slip Op 04712)





People v Horn


2020 NY Slip Op 04712


Decided on August 20, 2020


Appellate Division, Fourth Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on August 20, 2020
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: WHALEN, P.J., PERADOTTO, LINDLEY, TROUTMAN, AND DEJOSEPH, JJ.


704 KA 15-00415

[*1]THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,
v
JACOB A. HORN, DEFENDANT-APPELLANT. 






FELDMAN AND FELDMAN, MANHASSET (STEVEN A. FELDMAN OF COUNSEL), FOR DEFENDANT-APPELLANT. 
BROOKS T. BAKER, DISTRICT ATTORNEY, BATH (JOHN C. TUNNEY OF COUNSEL), FOR RESPONDENT. 


 Appeal from a judgment of the Steuben County Court (Marianne Furfure, A.J.), rendered December 23, 2014. The judgment convicted defendant upon a jury verdict of murder in the second degree, criminal possession of a weapon in the third degree and tampering with physical evidence (three counts). 
It is hereby ORDERED that the judgment so appealed from is affirmed.
Memorandum: Defendant appeals from a judgment convicting him upon a jury verdict of, inter alia, murder in the second degree (Penal Law § 125.25 [1]). We affirm. The case arose from the violent death of an alleged drug dealer and white supremacist whose body the police found concealed in the cupboard of an abandoned mansion. Defendant has given three inconsistent accounts of the victim's death. First, he told his fiancée that he killed the victim in a rage. Then, he told a police investigator that he killed the victim in self-defense. Later, at trial, he testified that his accomplice coerced him into participating in the murder and subsequently lying to the police.
At the outset, we note that defendant failed to preserve for our review his contention that he was denied his Fourteenth Amendment right to a fair trial by County Court's rulings (see People v Lane, 7 NY3d 888, 889 [2006]). We decline to exercise our power to review that contention as a matter of discretion in the interest of justice (see CPL 470.15 [6] [a]).
Defendant contends that the evidence is legally insufficient to support the conviction of murder in the second degree because he proved the affirmative defense of duress by a preponderance of the evidence, thereby negating the element of intent. Defendant failed to preserve that contention for our review because his motion for a trial order of dismissal was not " specifically directed' " at the alleged error (People v Gray, 86 NY2d 10, 19 [1995]; cf. People v Hammond, 84 AD3d 1726, 1726 [4th Dept 2011], lv denied 17 NY3d 816 [2011]). In any event, even assuming, arguendo, that defendant established duress, we reject his contention that such a defense would negate the requisite intent to kill (see Penal Law § 125.25 [1]). Duress is an affirmative defense that does not negate any of the elements that the People are required to prove in the first instance, such as intent (see § 40.00; People v Bastidas, 67 NY2d 1006, 1007 [1986], rearg denied 68 NY2d 907 [1986]; see also United States v Leal-Cruz, 431 F3d 667, 671 [9th Cir 2005]). Furthermore, we conclude that defendant's confession to his fiancée and his statement to the police constitute legally sufficient evidence that he intended to kill the victim (see People v Geddes, 49 AD3d 1255, 1256 [4th Dept 2008], lv denied 10 NY3d 863 [2008]).
To the extent that defendant contends that the verdict is against the weight of the evidence with respect to the murder count, we reject that contention. Viewing the evidence in light of the elements of that crime as charged to the jury (see People v Danielson, 9 NY3d 342, 349 [2007]), we conclude that the verdict is not against the weight of the evidence (see generally [*2]People v Bleakley, 69 NY2d 490, 495 [1987]).
Defendant further contends that the court abused its discretion by allowing the prosecutor to question him about his sex life. More particularly, the prosecutor asked defendant during cross-examination whether he lied to his fiancée in order to convince her to have unprotected sex with him by falsely telling her that he had not had unprotected sex with other women. Insofar as defendant contends that the testimony is irrelevant, we reject his contention. A testifying defendant "may be cross-examined concerning any immoral, vicious or criminal acts of his [or her] life [that] have a bearing on his [or her] credibility as a witness, provided the cross-examiner questions in good faith and upon a reasonable basis in fact" (People v Duffy, 36 NY2d 258, 262 [1975], mot to amend remittitur granted 36 NY2d 857 [1975], cert denied 423 US 861 [1975]). The testimony here was relevant to defendant's credibility and was properly admitted for impeachment purposes (see People v Chebere, 292 AD2d 323, 324 [1st Dept 2002], lv denied 98 NY2d 673 [2002]; People v Roberts, 197 AD2d 867, 868 [4th Dept 1993], lv denied 82 NY2d 901 [1993]). Insofar as defendant contends that the probative value of the testimony at issue was substantially outweighed by its prejudicial effect, he failed to preserve his contention for our review because he did not object to the testimony on that ground (see People v Cullen, 110 AD3d 1474, 1475 [4th Dept 2013], affd 24 NY3d 1014 [2014]), and we decline to exercise our power to review that contention as a matter of discretion in the interest of justice (see CPL 470.15 [6] [a]).
We reject defendant's contention that the court abused its discretion by admitting seven photographs of his body in evidence for the alleged purpose of showing that he did not sustain injury in the incident. Those photographs were relevant to disprove self-defense, which the People reasonably anticipated would be raised by defendant (see People v Di Bella, 277 AD2d 699, 702 [3d Dept 2000], lv denied 96 NY2d 758 [2001]). Although defendant further contends that the court abused its discretion by admitting in evidence an eighth photograph depicting a "666" tattoo on his neck, defendant failed to preserve his contention for our review (see People v Dickerson, 42 AD3d 228, 236-237 [1st Dept 2007], lv denied 9 NY3d 960 [2007]), and we decline to exercise our power to review that contention as a matter of discretion in the interest of justice (see CPL 470.15 [6] [a]).
We agree with defendant, however, that the court abused its discretion when it permitted the prosecutor to play for the jury a scene from the film, The Boondock Saints. The scene takes place inside a courtroom, where the protagonists threaten everyone with pistols. Some people in the scene, presumably those playing the jurors, watch in astonishment while ducking for cover. The protagonists make loud, self-aggrandizing statements, declaring themselves vigilantes tasked by God with bringing justice to the world (e.g. "Each day we will spill their blood till it rains down from the sky!"). For those who do not behave morally, the protagonists offer a message: "One day you will look behind you and you will see we three . . . and we will send you to whichever God you wish." The protagonists put their guns to the back of the defendant's head while he is knelt on the floor in an execution-style pose. Gunfire erupts, and everyone runs out of the courthouse screaming.
The prosecutor's ostensible reason for playing that particular scene was to rebut defendant's testimony that he was coerced by his accomplice into participating in the murder and subsequently lying to the police. The relevance of that scene is that defendant posted quotations from it on social media two days after the victim's murder and one day before he gave the allegedly coerced statement to the police.
Although that scene from The Boondock Saints was relevant for that purpose, relevant evidence "may still be excluded by the trial court in the exercise of its discretion if its probative value is substantially outweighed by the danger that it will unfairly prejudice the other side or mislead the jury" (People v Scarola, 71 NY2d 769, 777 [1988]). Here, the prejudice created by playing that scene results not only from the possibility that the jury would perceive defendant's taste in movies to be an endorsement of violence. The violence in question was directed in part against a jury during a criminal trial, and thus the scene also likely affected the jury's objectivity. Moreover, the scene degrades the criminal justice system, and the jury system in particular, implying that the reasonable doubt legal standard is responsible for freeing murderers and that justice can only be accomplished by vigilantes. On the other hand, the scene had little probative value. Defendant never actually posted the video on social media; he only quoted from it. The [*3]prosecutor could simply have asked defendant on cross-examination whether the quote referenced a scene from a film in which vigilantes execute a criminal. Playing the scene served no purpose other than to prejudice the jury against defendant. Because the probative value of the scene from The Boondock Saints video was substantially outweighed by the danger that its admission would prejudice defendant or mislead the jury, the court abused its discretion in admitting it (see People v Herman, 187 AD2d 1027, 1028 [4th Dept 1992]; cf. Scarola, 71 NY2d at 777).
Nevertheless, we conclude that the error is harmless. The evidence against defendant is overwhelming and there is no "significant probability" that the jury would have acquitted defendant but for the error (People v Crimmins, 36 NY2d 230, 242 [1975]; see People v Taylor, 148 AD3d 1607, 1608 [4th Dept 2017]). There is no dispute that defendant participated in the victim's murder. Prior to trial, defendant gave two differing accounts of the murder but, in both versions, he acknowledged intentionally killing the victim. Then, at trial, he tried to blame his accomplice, presenting an implausible duress defense. An acquittal would not have been impossible, but we cannot conclude that under the circumstances there would have been a significant probability of acquittal had the jury not watched The Boondock Saints. Although we conclude that reversal is unwarranted on that ground, we take this opportunity to admonish the prosecutor and to remind him that "prosecutors have special responsibilities . . . to safeguard the integrity of criminal proceedings and fairness in the criminal process' " (People v Huntsman, 96 AD3d 1387, 1388 [4th Dept 2012], lv denied 20 NY3d 1099 [2013], quoting People v Santorelli, 95 NY2d 412, 421 [2000]).
We reject defendant's related contention concerning the admission of another clip featuring a video montage of the Sons of Anarchy television program, which defendant posted on his social media page on the same date that he posted the quote from The Boondock Saints. We conclude that the Sons of Anarchy video was relevant, and that its probative value was not outweighed by its potential for prejudice (see generally People v Hayes, 168 AD3d 489, 490 [1st Dept 2019], lv denied 33 NY3d 977 [2019]).
Defendant further contends that the Sandoval ruling was an abuse of discretion (see People v Standsblack, 162 AD3d 1523, 1524-1525 [4th Dept 2018], lv denied 32 NY3d 1008 [2018]). We reject that contention. Because the crime of criminal impersonation "involve[s] acts of dishonesty and thus [was] probative with respect to the issue of defendant's credibility," the court did not abuse its discretion in allowing the People to question defendant about that conviction on cross-examination (see People v Thomas, 165 AD3d 1636, 1637 [4th Dept 2018], lv denied 32 NY3d 1129 [2018], cert denied — US &mdash, 140 S Ct 257 [2019] [internal quotation marks omitted]).
We reject defendant's contention that the People violated CPL 710.30. The People were not required to include his statement that the victim "could take a hit" in a CPL 710.30 notice because the statement was used solely for purposes of impeachment (see People v Gunter, 284 AD2d 932, 932 [4th Dept 2001], lv denied 96 NY2d 902 [2001]; People v Rigo, 273 AD2d 258, 258-259 [2d Dept 2000], lv denied 95 NY2d 937 [2000]; People v Sanzotta, 191 AD2d 1032, 1032 [4th Dept 1993]).
Contrary to defendant's further contention, the court did not err in failing to, sua sponte, charge the jury on intoxication given defendant's theory at trial (see People v Herrera, 161 AD3d 1006, 1007 [2d Dept 2018], lv denied 33 NY3d 1105 [2019], reconsideration denied 34 NY3d 951 [2019]). Contrary to defendant's related contention, counsel was not ineffective for failing to request such a charge or for any additional reason claimed by defendant. Viewing the evidence, the law and the circumstances of the case, in totality and as of the time of the representation, we conclude that defense counsel provided meaningful representation (see generally People v Baldi, 54 NY2d 137, 147 [1981]).
Defendant failed to preserve his remaining contentions for our review, and we decline to exercise our power to review those contentions as a matter of discretion in the interest of justice (see CPL 470.15 [6] [a]).
All concur except Lindley, J., who dissents and votes to reverse in accordance with the following memorandum: I respectfully dissent because I do not agree with the majority that [*4]County Court's error in admitting in evidence the video of a scene from The Boondock Saints is harmless. The error is not harmless because the proof of guilt is not overwhelming. I would thus reverse the judgment and grant defendant a new trial on counts one, two, three, five and six of the indictment.
The evidence in this case established that the victim was killed after being repeatedly struck in the head with a fire poker. There is no dispute that defendant and his codefendant were the only people present when the victim was killed. Thus, we know that one or both of them committed the murder. We also know that the codefendant alone returned to the crime scene with bleach and ammonia hours after the murder and attempted to clean blood from the floors and walls. Defendant told his girlfriend the next day that he killed the victim in a fit of rage. When later questioned by the police, however, defendant said that he alone killed the victim in self-defense after they argued about Adolf Hitler. Oddly, the codefendant, who was questioned separately, admitted to the police that he alone killed the victim. The codefendant later pleaded guilty to murder in the second degree in return for a sentence promise of 20 years to life. The codefendant was awaiting sentencing when defendant's case went to trial.
During their direct case, the People relied primarily on defendant's admissions that he killed the victim. The parties stipulated that the codefendant already pleaded guilty to murder and would invoke his rights under the Fifth Amendment if called to the stand. Although both defendant and the codefendant were charged as accessories, the People presented no evidence indicating how defendant aided and abetted the codefendant in the killing, nor did they present any evidence of how the codefendant aided and abetted defendant. Instead, when the People rested, their theory was that defendant killed the victim as a principal.
When defendant took the stand, he raised the defense of duress, testifying that the codefendant struck the victim multiple times in the back of the head with a fire poker and then handed the weapon to defendant and demanded that he strike the victim as well. Defendant further testified that he felt threatened by the codefendant, who previously claimed to have killed another person, and that he was horrified to see the victim killed in such a brutal manner by the codefendant's unprovoked violence. According to defendant, he swung the fire poker once at the victim after the victim had already been struck multiple times in the head by the codefendant. Defendant believed that the victim was probably dead when he struck him.
On cross-examination, the prosecutor sought to admit in evidence a video of an extremely violent scene from The Boondock Saints, which defendant acknowledged was his favorite movie and from which he quoted on social media. According to the People, the scene was relevant to defendant's state of mind when he confessed to the police. Over defendant's objection, the court admitted the video, which was played for the jury. The court also allowed the prosecutor to introduce a video depicting a violent scene from the television show Sons of Anarchy that defendant had posted on social media.
Although the majority agrees with the People that the videos were relevant, it concludes that the court abused its discretion in admitting in evidence the scene from The Boondock Saints on the ground that its prejudicial effect greatly exceeds its probative value, stating that "[p]laying the scene served no purpose other than to prejudice the jury against defendant." The majority nevertheless finds the error to be harmless given that defendant admitted to the police and his girlfriend that he intentionally killed the victim and that he undisputedly was present when the murder was committed.
In my view, neither video was relevant to any material issue. The fact that defendant enjoyed violent television shows and movies does not contradict his testimony that he was horrified to see the codefendant repeatedly strike the victim in the head with a fire poker, nor does that fact in any way undermine defendant's duress claim. Moreover, as the majority concludes, the probative value of the scene from The Boondock Saints was substantially outweighed by its prejudicial effect, which was enormous considering the content, as described above by the majority. We thus all agree that the court erred in admitting the movie scene in evidence even if the court was correct in finding it to be relevant. The question then becomes whether the error is harmless.
"Under our traditional harmless error analysis, an appellate court does not reach the [*5]question of prejudice unless the evidence is overwhelming in the first instance" (People v Mairena, 34 NY3d 473, 484 [2019]). As the Court of Appeals stated long ago, "unless the proof of the defendant's guilt, without reference to the error, is overwhelming, there is no occasion for consideration of any doctrine of harmless error" (People v Crimmins, 36 NY2d 230, 241 [1975]). "That is, every error of law (save, perhaps, one of sheerest technicality) is, ipso facto, deemed to be prejudicial and to require a reversal, unless that error can be found to have been rendered harmless by the weight and the nature of the other proof" (id.).
Although " overwhelming proof of guilt' cannot be defined with mathematical precision" (id.), it stands to reason that overwhelming proof of guilt requires more evidence of guilt than proof beyond a reasonable doubt. If that were not so, then all errors would be harmless in cases where the verdict is not against the weight of the evidence.
Here, giving deference to the jury's credibility determinations, I would agree that the People proved defendant's guilt of murder in the second degree beyond a reasonable doubt and that, viewing the evidence in light of the elements of that crime as charged to the jury (see People v Danielson, 9 NY3d 342, 349 [2007]), the verdict is not against the weight of the evidence (see generally People v Bleakley, 69 NY2d 490, 495 [1987]). "Although a different verdict would not have been unreasonable, it cannot be said that the jury failed to give the evidence the weight it should be accorded" (People v Metales, 171 AD3d 1562, 1564 [4th Dept 2019], lv denied 33 NY3d 1107 [2019]; see Bleakley, 69 NY2d at 495).
I cannot agree, however, that there is overwhelming proof of defendant's guilt. While defendant admitted to the police that he alone killed the victim, that admission of sole culpability is belied by the fact that the codefendant pleaded guilty to intentional murder for killing the same person. The same is true of defendant's admission to his girlfriend.
Here, the only evidence that defendant acted as an accessory to the criminal conduct of the codefendant is defendant's testimony that he struck the victim once after the codefendant had unexpectedly struck the victim multiple times in the head with the fire poker. If that is really what happened, it lends credence to defendant's claim of duress. Moreover, if the codefendant had repeatedly struck the victim in the head before handing the fire poker to defendant, it raises a question whether the victim was already dead when he was struck by defendant, as defendant suggested during his testimony. Even though the jury evidently did not credit defendant's testimony, it does not necessarily follow that the proof of guilt is overwhelming.
Considering that there is no evidence that the murder was planned or premeditated, it appears that either defendant or the codefendant suddenly decided to kill the victim for some unknown reason by striking him in the head with the fire poker. That likely scenario leaves little room for accomplice liability. Given that the codefendant pleaded guilty to intentional murder, the proof is far from overwhelming that defendant alone killed the victim. And considering that the only evidence of defendant's guilt as an accessory is his own testimony, which also supports his duress defense, the proof of defendant's guilt as an accessory is similarly not overwhelming. In sum, there are too many unanswered questions in this case for us to conclude that the court's egregious evidentiary ruling constitutes harmless error.
Entered: August 20, 2020
Mark W. Bennett
Clerk of the Court